**UNITED STATES of America**

v.

**W. John MITCHELL, II a/k/a Jack Mitchell, Gary Brouillette, Prudential Committee of Websterville Fire District No. 3 of Websterville, Vermont.**

**Crim.A. Nos. 90–78–01 to 90–78–03.**

United States District Court,
D. Vermont.

May 15, 1991.

John–Claude Charbonneau, Asst. U.S. Atty., Rutland, Vt., for U.S.

William K. Sessions, III, Sessions, Keiner, Dumont, Barnes and Everitt, Middlebury, Vt., for Mitchell.

Gabor Rona, Rubin, Rona, Kidney and Myer, Barre, Vt., for Brouillette.

Eric G. Parker, Abare, Nicholls and Parker, Barre, Vt., for Websterville.

## OPINION AND ORDER

BILLINGS, Chief Judge.

On January 17, 1991, defendants W. John Mitchell II, a/k/a Jack Mitchell, and Gary Brouillette moved to suppress statements made by them to Environmental Protection Agency ("EPA") investigators on July 10, 1990, on the grounds that their Fifth Amendment rights against self-incrimination were violated. The government opposed the motions. Oral argument was held on March 22, 1991. For the reasons herein stated, defendants' motions to suppress statements are GRANTED.

### Background

Upon consideration of the oral evidence and exhibits, the court finds as follows. Defendant Mitchell was the part-time Water System Operator of the Websterville, Vermont Fire District No. 3 Water System. Defendant Brouillette was a part-time member of the Prudential Committee of the Websterville, Vermont Fire District No. 3 Water System and was responsible for conducting water quality tests.

On July 10, 1990, at an unspecified time between 10:00 a.m. and 2:00 p.m., EPA criminal investigators Miner Tuttle and Jennifer Olsen, and Edward Bour, an EPA chemist, arrived unannounced at defendant Mitchell's residence. The purpose of the EPA visit was to interrogate Mitchell about the taking of water turbidity tests and the reports of those tests filed with the EPA. Investigator Tuttle was conducting a criminal investigation of Mitchell and Brouillette because of EPA suspicions that the two were not taking water turbidity tests in accordance with EPA regulations and that they were filing false reports of testing and test results. The EPA based its suspicions on a series of test reports from the Websterville water system that were so uniform in result that the EPA believed that they had been falsified.

At the same time that Investigator Tuttle was conducting the Websterville investigation, he was also conducting at least two other criminal investigations of violations of EPA regulations in the state of Vermont. Tuttle's intention was to report the results of all of his investigations to the United States Attorney for criminal prosecution or other appropriate action.

When Tuttle and his investigating team arrived at Mitchell's house, Tuttle showed Mitchell his identification credentials. Mitchell noticed Tuttle's picture and name on the card but did not observe the words "Office of Criminal Investigation" in small print at the bottom of the card.

Tuttle informed Mitchell that he wanted to talk about the water system and be given a tour of it. As the chief administrative officer of the water system, and knowing that the EPA generally aided and assisted in the administration of public water facilities, Mitchell felt compelled to cooperate with Tuttle, respond to all questions, and obey Tuttle's directions and requests. Moreover, Mitchell told Tuttle that he was glad to have the EPA's presence at the Websterville water facility and that he

wanted the EPA's guidance on various water quality matters.

Upon Tuttle's direction, Mitchell gave the EPA investigative team a tour of the reservoir. The record does not indicate whether Mitchell travelled to the reservoir with the EPA investigators as a group, but it does indicate that he was alone with the three members of the EPA team at the reservoir and its offices. The EPA investigative team concluded its tour of the reservoir at the water system's office. There, Tuttle and his team inspected water system records. Meanwhile, Mitchell continued to answer Tuttle's questions.

Mitchell testified that at a certain point the interrogation became "heated," and that he was angry and frustrated about being deceived by Tuttle as to the true nature of the investigation. Tuttle admitted in his testimony that he was aware that the interrogation was becoming increasingly hostile. Towards the end of the interrogation, Tuttle threatened Mitchell by telling him that it was a crime to lie to a federal agent.

Tuttle's interrogation of Mitchell at his house lasted for approximately thirty minutes. It continued for approximately another hour at the reservoir. At no time during the interrogation did Tuttle state that he was a criminal investigator, that he was conducting a criminal investigation, or that Mitchell had rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). At no time did Mitchell ask the EPA team to leave or stop questioning him; the interrogation terminated only when Tuttle was through making the inspection and asking questions.

At approximately 5:30 p.m., the EPA officials went unannounced to defendant Brouillette's house. When Brouillette answered the door, Tuttle showed his identification credentials to Brouillette in the same manner as he had to Mitchell. Tuttle stated that he wished to talk to Brouillette because he understood that Brouillette performed the water turbidity tests and wrote the water system reports. As with Mitchell, Tuttle did not give Brouillette any warnings about the fact that he was conducting a criminal investigation or that Brouillette had rights pursuant to *Miranda*.

During the interrogation, Brouillette was alone with Tuttle and the EPA team in the kitchen of his home. Brouillette, like Mitchell, understood that water system officials were legally required to cooperate with the EPA and so he felt unable to terminate the interrogation or leave the area. As the interrogation progressed, Brouillette became increasingly more apprehensive. Nevertheless, he answered all of Tuttle's questions. At some point during the interrogation, Tuttle told Brouillette not to lie because it was a criminal offense to lie to a federal official. At the end of the interrogation, Brouillette asked Tuttle what he was going to do with the information he had obtained. Tuttle told him that he intended to turn over his reports to the United States Attorney for appropriate action.

Tuttle in fact did turn his reports over to the United States Attorney's office. Two days later, Tuttle returned with a subpoena *duces tecum* for both Mitchell and Brouillette. Seven days later, Tuttle again returned with a second subpoena for defendant Mitchell.

Subsequently, Mitchell and Brouillette were indicted for violations of 18 U.S.C. § 371. Before the court are motions by defendants Mitchell and Brouillette to suppress the incriminating statements made to EPA officials during these incidents of questioning.

### Discussion

The two questions before the court are (1) whether the defendants underwent a "custodial interrogation" when they made incriminating statements so that *Miranda* warnings were legally required; and (2) whether the government used impermissible trickery and deception in eliciting the incriminating statements from defendants, making the statements involuntary and not the product of a knowing waiver of defendants' rights. If either of these questions is answered affirmatively, then the statements must be suppressed.

Defendants made incriminating statements to government agents concerning their conduct as operators of the water system.[1] Defendants and the government agree that no warnings of any kind were given to defendants before or during their interrogation. Defendants state, and the government does not contest, that they believed they were providing information to the EPA as a part of the EPA's routine oversight of local public water facilities. They state that they were required by law to permit on-site inspection of the water system and its records and that they were required to provide other information as demanded by the EPA. They argue that their participation in the interrogation that took place incidental to this inspection was therefore not voluntary. They also contend that the inculpatory statements they made to EPA officials were made without the voluntary and knowing waiver of their privilege against self-incrimination.

The government's argument is that its officials were not legally required to give *Miranda* warnings to the defendants because the questioning did not take place while the defendants were in custody within the meaning of *Miranda*. Special Agent Tuttle testified that the questioning took place as part of a routine inquiry into possible irregularities in water quality testing reports filed by defendants with the EPA. He testified that the questioning was conducted in a friendly manner and environment, and that defendants were free not to answer questions if they chose or to terminate the questioning at their will.

*The Custodial Interrogation Issue*

■ *Miranda* warnings are required prior to a subject's questioning when that questioning is an "interrogation" as defined in *Miranda* and its progeny, and is performed while the subject is in custody or a custody-like situation. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). To decide whether these circumstances exist, courts are directed to examine the totality of the circumstances surrounding the questioning. *Id.* at 444, 86 S.Ct. at 1612.

■ In order for questioning to constitute an interrogation, the questioning itself must be of a kind reasonably likely to elicit incriminating responses from the subject. *See Rhode Island v. Innes*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Although the central focus is on the subjective impression of the subject of the interrogation, the intentions of the law enforcement officials and their knowledge of special susceptibilities of the subjects at the time of the questioning are also relevant. *See id.* at 301–302, 302 n. 8, 100 S.Ct. at 1689–1690, 1690 n. 8.

■ In this case, defendants believed that they were legally obligated to answer questions. As for the intentions of the law enforcement officers, the EPA team questioned defendants in an investigation of which defendants were clearly the targets. The questions of the EPA investigators were designed to elicit incriminating responses over the course of their inquiry. Moreover, the EPA investigators knew of the defendants' beliefs that they were legally obligated to answer questions. The EPA team was, therefore, aware that defendants were specially susceptible to law enforcement questioning. Under such circumstances, the EPA officials were conducting interrogations. If those interrogations occurred in custodial circumstances, then *Miranda* warnings were required to have been given.

As for whether defendants were in custody or a custody-like situation, it does not defeat defendants' argument that defendants were not under arrest at the time of the interrogations. Although *Miranda* addressed factual situations that involved physical custody such as an arrest, neither *Miranda* nor its progeny have limited the definition of custody to such circumstances. *See Beckwith v. United States*, 425 U.S.

---

1. Evidence before the court at this time does not indicate under what exact authority the EPA's site inspection and interrogation took place. The EPA's authority to inspect public water facilities and to obtain records and other information comes from 42 U.S.C. § 300j–4(b)(1), and its effectuating regulation, 40 C.F.R. § 142.34. We assume, therefore, that the conduct of the EPA agents at Websterville was pursuant to the authority of this statute and regulation.

341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961)).

In *Beckwith*, 425 U.S. at 348, 96 S.Ct. at 1617, the Court stated that "non-custodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where the behavior ... of 'law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.'" *See also United States v. Mast*, 735 F.2d 745, 748 (2d Cir. 1984). In determining whether a non-custodial interrogation has occurred, the court must look to the totality of the circumstances. *Id.* at 748. If such an examination indicates that a reasonable innocent person would believe that he or she was not free to leave the presence of the questioners or that he or she was not free to remain silent, a custody-like situation existed. *See id.*

In *U.S. v. Booth*, 669 F.2d 1231, 1235 (9th Cir.1981), the court looked at the circumstances of the interrogation to determine whether the suspect was in a custody-like situation. The court identified the major factors in determining a custody-like situation as (1) the language used to summon the individual; (2) the extent to which the individual is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. *Id.; see also Mast*, 735 F.2d at 748 (taking similar approach to custody analysis).

In terms of the first *Booth* factor, the language used to summon the individual, it is uncontroverted that the investigation was being conducted under authority of federal statutes and regulations and that defendants were required by law to respond to EPA investigative authority. The language used to initiate the interrogations of defendants was, therefore, inherently compulsory. Particularly compulsory was Special Agent Tuttle's insistence that his team be allowed to inspect the reservoir facility and the water system's records.

As for the second factor, the extent to which the subject is confronted with evidence of guilt, although there is no evidence that Mitchell was confronted with evidence of alleged falsification of records or other improprieties initially, Tuttle increasingly brought these facts to bear as the interrogation progressed. In Brouillette's case, there is evidence that Tuttle used the water system's records obtained in Mitchell's previous interrogation to pressure Brouillette. These records provided evidence of Brouillette's guilt.

The third factor for analysis, the physical surroundings of the interrogation, also supports a finding of custody-like circumstances. Although defendants were in their homes during the interrogations, they were questioned alone and were confronted by three government officials. Moreover, although the questioning of Brouillette remained centered in his home, Mitchell was compelled to accompany the EPA investigative team to the reservoir facilities so that the EPA team could inspect the premises. During this phase of the interrogation, Mitchell was alone with the EPA team at the reservoir and the water system office. This setting cannot be compared to cases in which interrogations took place in the suspect's office or workplace, as with many of the IRS cases, because the reservoir is remote and cut off from public sight and intercourse. *Compare United States v. Serlin*, 707 F.2d 953, 958 (7th Cir.1983) (holding that interviews of taxpayer by IRS agents in taxpayer's home and office were not custodial because family and employees of taxpayer were present and taxpayer was not incommunicado).

The fourth factor in the *Booth* analysis, the duration of the interrogation, also supports a finding of custody-like circumstances. The interrogation of Mitchell, including both the questioning in his home and at the reservoir, totalled one-and-one-half hours. The interrogation of Brouillette totalled thirty to forty-five minutes. These interrogations were significantly longer than the interrogation in *Booth*. *See Booth*, 669 F.2d at 1235.

The fifth *Booth* factor, the nature and degree of pressure used to detain the subject, is the most persuasive factor supporting a finding of custody in this case. One indication of the nature and degree of pressure is whether and to what extent a subject was warned about the nature of the interrogation or of his or her rights. *See Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1424, 22 L.Ed.2d 684 (1969). In many cases that have upheld IRS interrogations of taxpayers, the IRS gave at least partial warnings. *See Beckwith*, 425 U.S. at 343, 96 S.Ct. at 1614; *see also Mast*, 735 F.2d at 750; *Serlin*, 707 F.2d at 955. Although the warnings may not have been sufficient to inform the subject of all of his or her rights, they were sufficient to put the subject on notice about the nature of the interrogation. *See Serlin*, 707 F.2d at 957 (upholding an interrogation in which IRS initially gave no warnings to subject who was not focus of investigation but provided warnings as soon as agents focused attention on subject's actions).

In this case, defendants were not given any warnings of their rights even though they were the targets of an EPA investigation. Moreover, the EPA team was conducting its investigation under color of laws and regulations that compelled the subjects to answer the team's questions. The application of such laws and regulations to an interrogation situation certainly increased the nature and degree of pressure on defendants.

The government offers *Beckwith* for the proposition that when legal authority compels cooperation in a government proceeding, the proceeding is not necessarily custodial and *Miranda* warnings need not be given prior to questioning, even though criminal liability may result from the making of incriminating statements. *Beckwith* dealt with a taxpayer's production of financial documents and participation in a tax audit.

We find *Beckwith* inapposite to the facts before us. A taxpayer generally is not required to produce financial documentation; the refusal to produce documentation merely means that the taxpayer may be unable to avail him or herself of some benefits of the tax laws and will have greater tax liability. Similarly, a taxpayer need not attend an audit; the failure to attend merely means that the government need not rely on the taxpayer's claims for credits or deductions. *See United States v. Dickerson*, 413 F.2d 1111, 1116 (7th Cir. 1969). Presence at an audit therefore cannot be considered custody.

Moreover, a taxpayer knows that the relationship between the taxpayer and the IRS is inherently an adversarial one. That relationship can be characterized as a zero-sum game: every point "won" by the IRS is "lost" by the taxpayer, in the sense of increased tax liability. In the course of conducting investigations, IRS agents do not provide tax counselling to taxpayers; they do not provide technical or regulatory guidance, and their relationship to the taxpayer is not commonly thought of as a collaborative one. The taxpayer is well aware that in dealing with the IRS and its agents, he or she is well-advised to have the assistance of an accountant or tax lawyer. *Miranda* warnings in connection with IRS investigations that fall short of outright physical custody are unnecessary. *See United States v. Prudden*, 424 F.2d 1021, 1033 (5th Cir.1970), *cert. denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970); *see also United States v. Sclafani*, 265 F.2d 408, 414–415 (2d Cir.1959), *cert. denied* 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed.2d 1534 (1959).

Unlike the taxpayer scenario of *Beckwith*, defendants in this case reasonably believed that the EPA investigative team was present under color of the laws and regulations permitting EPA officials to enter and inspect water facilities, inspect records, and acquire information. Moreover, the obligation of water system operators to provide other information as required by EPA regulations includes the duty to answer questions put to operators by EPA investigators. *See* 42 U.S.C. § 300j–4(a). Defendants thus reasonably believed that they were not free to refuse to answer the investigators' questions, terminate the questioning, or to leave or ask the investigators to leave the premises. In

contrast to a suspect who is able to refuse to answer questions so as to avoid self-incrimination, Mitchell and Brouillette believed that by refusing to answer questions they would breach the law and incur further legal liability. These beliefs put them under a high degree of psychological pressure to answer. *See United States v. Caiello*, 420 F.2d 471, 473 (2d Cir.1969) (stating that compulsive aspect of interrogation, and not strength or content of government's suspicions at time of questioning, lead court to impose *Miranda* requirements with regard to questioning of suspect not in custody).

Thus, we find that neither Mitchell nor Brouillette could reasonably have concluded that they were free to leave or to refuse to answer questions put to them by the EPA investigative team. We conclude that the interrogations of defendants Mitchell and Brouillette were conducted while their freedom of action and movement was significantly restricted by the EPA investigators. The EPA investigators, therefore, were required to advise the defendants of their *Miranda* rights prior to interrogating them. Because the government officials failed to do so, incriminating statements made by defendants in the ensuing interrogation were not voluntarily made and must be suppressed.

*The Trickery and Deceit Claim*

■ Even if we had found that the interrogation was not custodial and that *Miranda* warnings were not required, we would nevertheless be required to suppress the statements made by Mitchell and Brouillette if the statements were procured through impermissible trickery and deception. The acquisition of incriminating statements by means of trickery and deceit violates the Fifth Amendment right against self-incrimination. *Mast*, 735 F.2d at 750.

■ Trickery and deception rise to the level of impermissibility if there is clear and convincing evidence that government officials performed one or more affirmative acts that materially mislead the defendant. *United States v. Tweel*, 550 F.2d 297 (5th Cir.1977). It is also impermissible for a government official to remain silent as to

the nature of the investigation when a legal or moral standard requires the government official to reveal his or her purposes. *See Prudden*, 424 F.2d at 1033 (holding that "[s]ilence can only be equated with fraud where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading"). In *Tweel*, 550 F.2d at 299, a case in which IRS agents failed to respond to a subject's questions about the nature of their tax investigation, the court stated that "the agent's failure to apprise the appellant of the obvious criminal nature of this investigation was a sneaky and deliberate deception by the agent ... and a flagrant disregard for the appellant's rights. The silent misrepresentation was both intentionally misleading and material."

In this case, the EPA investigators acted affirmatively to delude Mitchell and Brouillette about the criminal nature of the EPA investigation. Tuttle and chemist Edward Bour instructed the defendants in the correct methods of conducting water quality testing and in other aspects of the operation of the water system. The EPA team's deceptive use of their advisory role in this manner were affirmative misleading acts that constitute impermissible trickery and deception.

Moreover, the EPA investigators remained silent under circumstances in which they had a duty to speak. *See id.; Prudden*, 424 F.2d at 1032. The EPA investigators relied on their legitimate roles as advisors and trainers to local water system officials in order to further their criminal investigation. Agent Tuttle testified that he was aware that defendants were looking to him and his team for guidance as to how to conduct the technical aspects of their activities. Tuttle testified that Mitchell told him that he was glad the EPA was there and that he and Brouillette wanted the EPA's help. The investigators' knowing reliance on the defendants' misperceptions of the EPA's role in Websterville as one of technical assistance and support was duplicitous, especially in light of the defendants' requests for guidance. Considering the fact that the EPA investigators knew

that the defendants were looking to the EPA for help, it is clear that the EPA investigators lead defendants down the garden path. The EPA investigators had a strong moral duty, as well as a legal one, to speak out and correct defendants' misperceptions. *See Prudden,* 424 F.2d at 1032.

Public policy concerns also lead to the conclusion that the conduct of the EPA investigators in this case was impermissible. As with our revenue system, the regulation and oversight of the nation's public water systems is based upon the good faith of the water system operators. Those operators should be able to expect the same good faith from the government in its oversight and enforcement activities. Moreover, the sound operation of the nation's public drinking water facilities depends upon the ability of facility operators to obtain guidance and technical advice about the complex procedures and methods required by federal regulations. Congress has fostered this solicitous relationship by statute. *See* 42 U.S.C. §§ 300j–1(a)(2)(B); (b)(1); and (d)(1). Conduct of the type seen in this investigation, if allowed to continue, will undermine the relationship of trust and reliance necessary to bring about effective and efficient federal oversight of the nation's drinking water system. As with the IRS' conduct in *Tweel,* 550 F.2d at 300, the EPA's conduct in this case was shocking.

As a final point, the government argues that law enforcement officials should not be required to be cognizant of the state of mind and subjective beliefs of the subjects of their interrogations. The law does not require such cognizance. It does require, however, that when the government relies on the force of its legal authority to compel participation in an interrogation, or when it relies on a statutorily created collaborative role to conduct an investigation, it must then insure that incriminating statements made by suspects are made after voluntary and knowing waiver of the right against self-incrimination.

Thus, for both legal and policy reasons, we must suppress the incriminating statements obtained through the trickery and deceit seen in this investigation.

*Conclusion*

In conclusion, we hold that the questionings of defendants Mitchell and Brouillette were interrogations, and were conducted under custodial circumstances. Accordingly, the failure of the EPA officials to warn defendants of their *Miranda* rights before conducting the interrogations means that the incriminating statements made by defendants were not voluntary and were given without the knowing and intelligent waiver of defendants' constitutional rights. The statements must therefore be suppressed.

Moreover, the EPA investigators used deception and trickery in the conduct of their interrogations of Mitchell and Brouillette. The deception and trickery used in these interrogations was of such a nature and degree that, regardless of whether the interrogations were custodial, the incriminating statements were made involuntarily. They therefore must be suppressed on this alternative ground.

Defendants' motions to suppress incriminating statements made by them to officials of the EPA are GRANTED.

SO ORDERED.