966 F.2d 92
 34 ERC 2109, 61 USLW 2015, 22 Envtl.
L. Rep. 21,291
 UNITED STATES of America, Appellant,
v.
W. John MITCHELL, II, a/k/a Jack Mitchell; Gary
Brouillette; Prudential Committee of Websterville
Fire District No. 3 of Websterville,
Vermont, Defendants-Appellees.
 No. 405, Docket 91-1383.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 22, 1991.
Decided June 8, 1992.
 
 Peter W. Hull, Asst. U.S. Atty., D. Vermont, Burlington, Vt. (George J. Terwilliger, III, U.S. Atty., and David V. Kirby, Asst. U.S. Atty., D. Vermont, of counsel), for appellant.
 Bonnie Barnes, Middlebury, Vt. (William K. Sessions, Middlebury, Vt., Gabor Rona and Eric Parker, Barre, Vt., of counsel), for defendants-appellees.
 Before: PRATT, MAHONEY and McLAUGHLIN, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 The United States appeals, pursuant to 18 U.S.C. § 3731 (1988), from a pretrial ruling of the United States District Court for the District of Vermont, Franklin S. Billings, Jr., then-Chief Judge, entered May 15, 1991 that suppressed certain statements made by defendants-appellees W. John Mitchell and Gary Brouillette to representatives of the United States Environmental Protection Agency ("EPA"). United States v. Mitchell, 763 F.Supp. 1262 (D.Vt.1991). The district court ruled that: (1) the statements were obtained during custodial interrogations without Mitchell and Brouillette having been advised of their constitutional rights as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); and (2) the statements were procured through trickery and deception in violation of the Due Process Clause of the Fifth Amendment.
 
 
 2
 We reverse.
 
 Background
 
 3
 A. The Events at Issue.
 
 
 4
 Mitchell is responsible for operating the water system of Websterville Fire District No. 3 ("WFD No. 3") in Websterville, Vermont under the supervision of the Prudential Committee of WFD No. 3 (the "Prudential Committee"), a legal entity under Vermont law of which Mitchell is a member. WFD No. 3 is a public community water system that supplies drinking water to approximately 420 people in Websterville. Mitchell receives $1,525.00 a year for these services. He is also a custodian/bus driver for the Barre Town Elementary School, a selectman in Barre Town, and has at times served as a part-time police officer in Barre Town and Barre City.
 
 
 5
 WFD No. 3 provides water from two quarries. This water is subject to various tests pursuant to the Safe Drinking Water Act, 42 U.S.C. § 300f (1988) et seq., and the National Primary Drinking Water Regulations, 40 C.F.R. pt. 141 (1991). One such required test is a daily sampling (at the point where the water enters into the distribution system) for the turbidity level, which measures the amount of suspended particulate matter in the water. Such particulate matter can come from human or animal feces, erosion, or surface water runoff, and can be a source of disease. It can also shield disease-producing organisms from destruction by commonly used disinfectants, such as chlorine. Some forms of particulate matter may also contribute to the development of a group of organic chemicals known as trihalomethanes, at least one of which, chloroform, is a known carcinogen.
 
 
 6
 Brouillette is also a member of the Prudential Committee. His responsibilities include taking samples of the water supply from an appropriate point in the system, transporting these samples to Barre City for turbidity tests, and reporting the results of these tests to the State of Vermont, which compiles the results of the testing and reports the compilation to the EPA. Brouillette is paid $25.00 per year for these services. He has been employed as a sales representative for the last twenty-six years, a position that requires frequent travel.
 
 
 7
 During the summer of 1990, the EPA became suspicious that the turbidity reports from WFD No. 3 were being falsified. An investigation was commenced under the direction of EPA Special Agent Miner W. Tuttle. Tuttle reviewed the low and consistently uniform results that had been reported from Websterville in the past and had aroused EPA concern, and EPA investigators conducted their own test on the water supply. Tuttle then decided to interrogate Mitchell and Brouillette concerning the suspected false turbidity reporting.
 
 
 8
 On July 10, 1990, Tuttle arrived unannounced at Mitchell's home, accompanied by EPA Special Agent Jennifer Olsen and Ed Bour, a government chemist. Tuttle presented his EPA credentials, which specified that he was an official of the EPA Office of Criminal Investigations, and a discussion ensued for twenty to thirty minutes on the front porch of Mitchell's house. Tuttle then accompanied Mitchell on a tour of the WFD No. 3 system, which took approximately another hour. In the course of the conversations between Tuttle and Mitchell, both at Mitchell's home and at the water facility, Mitchell made certain inculpatory statements indicating that the turbidity reports were not conducted daily, as required and reported. In particular, Mitchell revealed his knowledge that the turbidity tests were probably not conducted on weekends or when Brouillette was absent from the Websterville area. At no time did Agent Tuttle, or any other government agent, provide Mitchell with Miranda warnings.
 
 
 9
 After they interviewed Mitchell, Tuttle and his colleagues went unannounced to Brouillette's house. Brouillette was initially unavailable, but was interviewed later in the afternoon upon returning home from work. Tuttle again displayed his EPA credentials and identified himself. Brouillette then invited Tuttle and his colleagues into Brouillette's home, where an interview ensued in the kitchen. Brouillette's wife and daughter were in an adjacent room. This interview lasted thirty to forty-five minutes. As with Mitchell, no Miranda warnings were given. During this interview, Brouillette told Tuttle that water samples for the turbidity tests were not taken from an appropriate entry point of the water system, but were in fact drawn from a faucet at Brouillette's home. Brouillette apparently made other statements indicating that the required turbidity testing and reporting standards were not being followed.
 
 
 10
 B. The Proceedings Below.
 
 
 11
 On September 13, 1990, a federal grand jury sitting in Rutland, Vermont returned a thirty-four count indictment against Mitchell, Brouillette, and the Prudential Committee. The grand jury charged the defendants with conspiracy to make false statements to the EPA concerning the results of turbidity tests conducted on the Websterville water supply, in violation of 18 U.S.C. § 371 (1988), and with thirty-three individual counts of willfully making false statements or representations by filing monthly reports that misrepresented the conduct of daily turbidity tests, in violation of 18 U.S.C. § 1001 (1988). Mitchell and Brouillette were arraigned on October 29, 1990, pleaded not guilty, and were released on unsecured personal recognizance bonds.
 
 
 12
 Mitchell and Brouillette thereafter moved to suppress the statements obtained from them by Tuttle during the July 10, 1990 interviews. The district court conducted a suppression hearing at which Tuttle, Mitchell, and Brouillette testified regarding the interviews.
 
 
 13
 Tuttle testified that he arrived at Mitchell's home on July 10, 1990, presented Mitchell with his credentials, and asked Mitchell to read them, which Mitchell appeared to do "for a minute or so." Tuttle did not independently advise Mitchell that Tuttle was a representative of the EPA's Office of Criminal Investigations, but his credentials so stated. Mitchell was told that he was not in custody and did not have to talk to the EPA representatives.
 
 
 14
 Tuttle explained to Mitchell that Tuttle "needed to interview [Mitchell] relative to his involvement with the water system," and engaged him in general conversation on that subject. According to Tuttle, Mitchell never indicated he did not wish to respond to Tuttle's inquiries; rather, Mitchell was "extremely cooperative." At no time, either at Mitchell's house or later at the water facility, did Tuttle or his colleagues make any threats or promises to Mitchell.
 
 
 15
 Eventually, the interview turned to specific questions about how the system operated and who was responsible for the turbidity testing. At its conclusion, in response to an inquiry by Mitchell regarding "what was going to happen," Tuttle advised that he would write a report and submit it to the EPA, "and then from there to the U.S. attorney's office....[,] who decided what would happen."
 
 
 16
 On cross-examination, Tuttle admitted to telling Mitchell that it was a crime to lie to a federal agent when it appeared that Mitchell was providing varying accounts as to the frequency of the turbidity testing. Tuttle also pressed Mitchell for amplified responses to Tuttle's questions concerning the turbidity tests, inquiring whether Mitchell was "sure" that the turbidity tests were conducted daily, as Mitchell originally stated. Mitchell then conceded that the tests were not conducted on weekends, and subsequently that they were not conducted when Brouillette was "on vacation," ultimately referring Tuttle to Brouillette for more specific information.
 
 
 17
 Tuttle testified that at times Mitchell appeared somewhat reluctant to talk about specific topics, and ultimately became "heated" as he became upset with the course of the interview, but never manifested a desire to terminate the interview. At one point during their conversation, Mitchell expressed frustration with dealing with the government and its regulations. Mitchell also indicated to Tuttle, however, "that he was really anxious to have the help" of the EPA. Tuttle felt that overall, Mitchell told Tuttle "everything ... that he ... honestly knew and ... was cooperating."
 
 
 18
 Mitchell testified that he looked at Tuttle's credentials, but did not notice the reference thereon to the EPA Office of Criminal Investigations. He indicated that he was pleased to see an inspector from the EPA. This was his first contact with the agency, and he felt "comfortable" with the EPA's interests in the Websterville system. Mitchell was never advised of his right to remain silent. Mitchell stated that when the conversation turned to the turbidity testing, however, the "tone" of the interview changed. Tuttle told Mitchell that it was a crime to lie to a federal agent, so he should tell the truth. Mitchell "felt nervous and scared that something was going on," and was also "scared" because "I was there [at the water facility] alone. I had nobody else to turn to." He further testified that "you don't normally" tell the federal government "anything," but "they're looking at our water system and the turbidity testing and I felt that we needed to talk to them."
 
 
 19
 On cross-examination, Mitchell stated that he had been a part-time police officer since 1972 or 1973, and had been involved in a number of police investigations. When pressed for something specific Agent Tuttle might have done to make him nervous and scared, Mitchell responded: "Basically, talking. He kept trying to get back to the turbidity issue, and he told me, I think a couple times, don't lie. Don't lie. Tell the truth. It's a lie--it's a lie--it's a criminal offense to lie to a federal agent."
 
 
 20
 Tuttle also testified concerning his conversation with Brouillette. He stated that he arrived at Brouillette's home, presented his credentials, and (unlike the Mitchell encounter) specifically identified himself as a criminal investigator. Tuttle believed he "might have" told Brouillette that he did not have to talk to the EPA representatives, and that it would be better to refuse the interview than to lie to federal agents.
 
 
 21
 Tuttle then told Brouillette that he "was there to discuss with [Brouillette] his procedures for taking turbidity tests and how they were submitted, how the testing was done." They proceeded to discuss "how [Brouillette] did the turbidity sampling." Tuttle testified that nobody made any threats or promises to Brouillette. Brouillette never indicated that he did not wish to continue the interview. Like Mitchell, Brouillette inquired about the outcome of the interview, and was similarly advised that Tuttle's report would go to the EPA, "and from there to the U.S. attorney's office to decide what may happen."
 
 
 22
 On cross-examination, Tuttle stated that Brouillette had said he was "doing the best he could do" with the turbidity testing in view of his full-time job and the limitations of funding, and that a replacement person was being sought. Tuttle added that Brouillette was cooperative throughout their discussion. Tuttle provided Brouillette with explanations concerning the proper conduct of the turbidity testing. In the course of that discussion, Brouillette revealed that he conducted the turbidity tests from a faucet at his home, and apparently that he had not always conducted daily tests, although the submitted reports reflected daily results.
 
 
 23
 Brouillette testified that he had no experience with the criminal justice system prior to his interview with Tuttle. He denied that Tuttle identified himself as a criminal investigator. Brouillette stated that he did not look at Tuttle's identification "closely." Brouillette added that he found Tuttle "sort of intimidating" because of "[c]ertain facial features, the eyeball contact."
 
 
 24
 Brouillette was not advised about his right to consult counsel or remain silent, and he felt that he had no choice but to cooperate with the EPA because "they were a strong part of the government." Brouillette concluded his direct examination as follows:
 
 
 25
 Q: Was there anything else about the way that [Tuttle] presented himself or his demeanor that made you feel intimidated?
 
 
 26
 A: Well, of course, he's bigger than I am. That's--he was--he is--his facial features were the most important factor to me, because I deal with people on a basis, as far as a sales representative, and you--you get to learn people's reactions and facial features, and as they're going to react or inter-react.
 
 
 27
 And so from that basis, to me he struck me as a very intimidating person, facial features and
 
 
 28
 . . . . .
 
 
 29
 Q: Can you specify what it was about his actual facial features or his demeanor, the way he carried himself, that made you feel intimidated?
 
 
 30
 A: Well, the coldness of the eyes.
 
 
 31
 Q: Is there anything about what he said or the way he said what he said that also played a role in whether or not you felt you had to answer questions.
 
 
 32
 A: No, I guess not.
 
 
 33
 On cross-examination, Brouillette conceded that no threats were made, and that Tuttle did not engage in any intimidating physical gestures.
 
 
 34
 The district court granted the motions to suppress. Reasoning that "neither Mitchell nor Brouillette could reasonably have concluded that they were free to leave or to refuse to answer questions put to them by the EPA investigative team," the court ruled that "[t]he EPA investigators ... were required to advise the defendants of their Miranda rights prior to interrogating them." 763 F.Supp. at 1268. As an alternative ground for suppression, the court held that the statements given by Mitchell and Brouillette were procured through trickery and deception in violation of the Due Process Clause of the Fifth Amendment because "the EPA investigators acted affirmatively to delude Mitchell and Brouillette about the criminal nature of the EPA investigation," and because "the EPA investigators remained silent under circumstances in which they had a duty to speak." Id.
 
 
 35
 This appeal followed.
 
 Discussion
 
 36
 On appeal, the government contends that the district court erred in its rulings that (1) Mitchell and Brouillette were entitled to Miranda warnings; and (2) their incriminating statements were procured through trickery and deception in violation of the Due Process Clause of the Fifth Amendment. We address these issues in turn.
 
 
 37
 A. Miranda Warnings.
 
 
 38
 It is settled that a prosecution may not use incriminating statements obtained from a defendant during a custodial interrogation[1] unless it demonstrates that, prior to any questioning, the defendant was " 'warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' " Berkemer v. McCarty, 468 U.S. 420, 428-29, 104 S.Ct. 3138, 3144-45, 82 L.Ed.2d 317 (1984) (quoting Miranda, 384 U.S. at 444, 86 S.Ct. at 1612). Miranda warnings are not required, however, when the defendant is not in custody. Beckwith v. United States, 425 U.S. 341, 346-47, 96 S.Ct. 1612, 1616-17, 48 L.Ed.2d 1 (1976); Miranda, 384 U.S. at 444, 86 S.Ct. at 1612.
 
 
 39
 Mitchell and Brouillette were interrogated by EPA representatives without being informed of their Miranda rights. Accordingly, the suppressibility of their statements turns on whether Mitchell and Brouillette were in custody during the EPA interviews. We review the district court's determination of the custody issue for clear error. United States v. Guarno, 819 F.2d 28, 32 (2d Cir.1987) (citing United States v. Ross, 719 F.2d 615, 621 (2d Cir.1983)). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); see also Anderson v. City of Bessemer City, 470 U.S. 564, 573-76, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985).
 
 
 40
 The test used in determining whether a defendant was in custody is an objective one. United States v. Hall, 421 F.2d 540, 544 (2d Cir.1969), cert. denied, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970). It asks whether a reasonable person in the defendant's position would have understood himself to be "subjected to restraints comparable to those associated with a formal arrest." Berkemer, 468 U.S. at 441, 104 S.Ct. at 3151; see generally 1 LaFave & Israel, Criminal Procedure § 6.6(c). This inquiry focuses upon the presence or absence of affirmative indications that the defendant was not free to leave. Compare Beckwith, 425 U.S. at 346-48, 96 S.Ct. at 1616-17 (IRS interview at defendant's home not custody due to lack of coercion) with Orozco v. Texas, 394 U.S. 324, 327, 89 S.Ct. 1095, 1097, 22 L.Ed.2d 311 (1969) (questioning by police in defendant's bedroom in early morning hours deemed custody because defendant not free to leave). "Custodial arrest is said to convey to the suspect a message that he has no choice but to submit to the [interrogating] officers' will and to confess." Minnesota v. Murphy, 465 U.S. 420, 433, 104 S.Ct. 1136, 1145, 79 L.Ed.2d 409 (1984) (citing Miranda, 384 U.S. at 456-57, 86 S.Ct. at 1618-19).
 
 
 41
 Decisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not "custodial" unless the authorities affirmatively convey the message that the defendant is not free to leave. See Campaneria v. Reid, 891 F.2d 1014, 1020 n. 1 (2d Cir.1989) (law enforcement officials must "act or speak in a manner that conveys the message that they would not permit the accused to leave"), cert. denied, --- U.S. ----, 111 S.Ct. 1419, 113 L.Ed.2d 471 (1991); Guarno, 819 F.2d at 31-32 (same); United States v. Hall, 421 F.2d at 545 (same). We have also stated that a custodial setting is one providing "inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak." Morales, 834 F.2d at 38.
 
 
 42
 Under the decisions of the Supreme Court and this circuit, the record in this case does not support a finding that Mitchell and Brouillette were subjected to custodial interrogation. That is, the conduct of the EPA representatives could not reasonably be understood as conveying a message that Mitchell and Brouillette were not free to leave or terminate their interviews.
 
 
 43
 Mitchell welcomed the EPA representatives into his home and was cooperative. He willingly divulged information. Although the interview grew "heated" at times, Tuttle engaged in no speech or actions which reasonably could be taken as intimidating, coercive, or restricting Mitchell's freedom of action. Even if Mitchell's testimony is examined in isolation, the circumstances described clearly are insufficient for a finding of custody. Mitchell stressed that Tuttle told him not to lie, but neither that admonition nor Mitchell's resulting nervousness tends to establish any indication by Tuttle that Mitchell was not free to leave or terminate the interview.
 
 
 44
 Moreover, the testimony of Tuttle and Mitchell that Tuttle never identified himself as a criminal investigator, together with Mitchell's testimony that he never noticed that information when he looked at Tuttle's EPA credentials, diminishes any contention that Mitchell was subjected to coercive pressures. In sum, the testimony at the suppression hearing clearly depicts a situation in which Mitchell willingly cooperated with the EPA representatives, free from coercive influences that could reasonably have been understood as constituting a restriction of his freedom to terminate the interview, or inducing a belief that submission to the will of the interrogating official was mandated.
 
 
 45
 It is similarly clear that Brouillette was not in custody during his interview. The entire interview occurred in the familiar surroundings of Brouillette's home. See Beckwith, 425 U.S. at 342, 347, 96 S.Ct. at 1616; United States v. Rakowski, 714 F.Supp. 1324, 1334 (D.Vt.1987) ("Lower courts ... almost universally hold that questioning in a suspect's home is not custodial because individuals in a familiar environment are less likely to be intimidated by law enforcement officers.") (collecting cases). But cf. Orozco, 394 U.S. at 327, 89 S.Ct. at 1097; United States v. Jones, 630 F.2d 613, 615 (8th Cir.1980) (location of interview, whether in home or elsewhere, not dispositive of custody issue). Brouillette freely answered the questions put to him by Tuttle, and remained calm throughout the interview. More importantly, Brouillette failed to identify any behavior on the part of the EPA representatives as reasonably suggesting that he could not have terminated the interview. Brouillette expressly conceded that no verbal threats or intimidating physical gestures were directed at him. The testimony by Brouillette that he was intimidated by the facial features of Agent Tuttle, particularly the "coldness" of his eyes, is clearly insufficient to establish the existence of custody under Miranda.
 
 
 46
 Mitchell and Brouillette press the further argument that they were required by law to cooperate with, and respond to, EPA investigative authority, citing 42 U.S.C. § 300 j-4(a), (c) (1988), and 40 C.F.R. § 142.34 (1991). They contend that this statutory and regulatory authority rendered the interviews inherently coercive, involving compelling pressures to respond and precluding any option to terminate them. The district court accepted this argument. See 763 F.Supp. at 1267-68.
 
 
 47
 We disagree. The most pertinent statutory provision would appear to be subdivision (b)(1) (rather than (a)) of § 300j-4, which authorizes EPA representatives, "upon presenting appropriate credentials and a written notice to any [regulated] supplier of water ... or person in charge of any of the property of such supplier ...[,] to enter any establishment, facility, or other property of such supplier or other person in order to determine whether such supplier or other person has acted or is acting in compliance with this subchapter." Subdivision (c) provides that any person who refuses to allow an EPA representative to "enter and conduct any audit or inspection authorized by subsection (b) of this section shall be subject to a civil penalty of not to exceed $25,000." For present purposes, 40 C.F.R. § 142.34 does not elaborate significantly upon these statutory provisions.
 
 
 48
 There is no basis in the record to conclude that Tuttle and his colleagues were conducting a § 300j-4(b)(1) statutory inspection. No written notice to that effect was presented, as required by the statute. No testimony at the suppression hearing indicated that the EPA agents invoked this statutory authority in any way, or that Mitchell or Brouillette were even aware of it. In sum, the existence of this statutory authority does not add significantly to the acknowledged fact that Tuttle, Olsen, and Bour were, and were known by Mitchell and Brouillette to be, EPA representatives. Miranda is nonetheless inapplicable in the absence of an affirmative indication by the EPA representatives that Mitchell and Brouillette were not free to leave or terminate their interviews. See Campaneria, 891 F.2d at 1020 n. 1; Guarno, 819 F.2d at 31-32; Hall, 421 F.2d at 545. The suppression hearing did not adduce evidence to support such a conclusion.
 
 
 49
 B. Trickery and Deception Under the Due Process Clause.
 
 
 50
 The district court also concluded that the EPA representatives employed trickery and deception in violation of the Due Process Clause of the Fifth Amendment so as to render the incriminating statements made by Mitchell and Brouillette involuntary and inadmissible even if Miranda warnings were not required. 763 F.Supp. at 1268. " 'When such a claim is raised, it is the duty of an appellate court ... "to examine the entire record and make an independent determination of the ultimate issue of voluntariness." ' " United States v. Mast, 735 F.2d 745, 749 (2d Cir.1984) (quoting Beckwith, 425 U.S. at 348, 96 S.Ct. at 1617 (quoting Davis v. North Carolina, 384 U.S. 737, 741-42, 86 S.Ct. 1761, 1764-65, 16 L.Ed.2d 895 (1966))); see also United States v. Cota, 953 F.2d 753, 758 (2d Cir.1992). Further, " 'the test of voluntariness [of a confession] is whether an examination of all the circumstances discloses that the conduct of "law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined...." Rogers v. Richmond, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961).' " United States v. Okwumabua, 828 F.2d 950, 952-53 (2d Cir.1987) (quoting Mast, 735 F.2d at 749) (additional citations by Mast omitted), cert. denied, 484 U.S. 1063, 108 S.Ct. 1022, 98 L.Ed.2d 987 (1988).
 
 
 51
 To prevail on a claim of trickery and deception, Mitchell and Brouillette "must produce clear and convincing evidence that the [EPA] agents affirmatively misled [them] as to the true nature of [their] investigation." Okwumabua, 828 F.2d at 953 (citing United States v. Serlin, 707 F.2d 953, 956 (7th Cir.1983)). It must also be shown that the misrepresentations materially induced the defendants to make incriminating statements. Mast, 735 F.2d at 750. Inculpatory statements are not involuntary when they result from a desire to cooperate, or from a defendant's ignorance of, or inattention to, his right to remain silent. Id. Further, the EPA agents' failure fully to explain the purpose of the interviews " 'does not amount to affirmative deceit unless defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead.' " Okwumabua, 828 F.2d at 953 (quoting Serlin, 707 F.2d at 956).
 
 
 52
 The district court concluded that by emphasizing their advisory role concerning water quality testing and other aspects of the operation of the water system, the EPA agents affirmatively misled Mitchell and Brouillette regarding the criminal nature of the EPA investigation. 763 F.Supp. at 1268. Invoking United States v. Prudden, 424 F.2d 1021, 1032 (5th Cir.), cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970), the court also ruled that the agents remained silent when they had a duty to speak concerning the purpose of their investigation.
 
 
 53
 Again, we disagree. In the first place, it is uncontested that Tuttle displayed his credentials, which made clear that he was a criminal investigator, at the outset of both interviews. Second, although Tuttle emphasized cooperation, he made no affirmative misrepresentations concerning the criminal purpose of the inquiry. See Mast, 735 F.2d at 750. Certainly, the defendants present no clear and convincing evidence of a material deception. Id. Rather, Tuttle permissibly emphasized cooperation and deemphasized, but did not misrepresent, the criminal nature of the inquiry. See Okwumabua, 828 F.2d at 953. In response, Mitchell and Brouillette fully cooperated, perhaps unwisely, and in doing so incriminated themselves. There was no basis for concluding that their will was overborne. See id. at 954; Mast, 735 F.2d at 751.
 
 
 54
 Even if it were binding upon us, Prudden would not call for a different result. In that case, a special agent of the intelligence division of the Internal Revenue Service entered an already ongoing investigation that ultimately led to the taxpayer's indictment. 424 F.2d at 1023-25. The district court suppressed incriminatory evidence provided by the taxpayer after the entry of the special agent, "finding that the Internal Revenue Service had obtained such statements and documents by engaging in a deliberate scheme to deceive Prudden in order to prevent his understanding that an investigation originally commenced by a revenue agent had materially altered at the time the special agent entered the case." 424 F.2d at 1022. The Fifth Circuit reversed, finding that "the record does not clearly and convincingly demonstrate a deliberate scheme to deceive." Id. It was deemed sufficient that the special agent so identified himself to the taxpayer and displayed his credentials, as required by the pertinent Internal Revenue Service regulations. Id. at 1032. We do not see how Prudden calls for suppression here.
 
 Conclusion
 
 55
 The pretrial suppression ruling of the district court is reversed and the case is remanded for further proceedings not inconsistent herewith. In taking this action, we are aware that the district court's ruling may have been influenced by a belief that a 34-felony indictment on the facts presented in this case constituted a clear case of administrative and prosecutorial overkill. Taking into account both the proper independence of the prosecutorial role and the importance of regulating the quality of drinking water, we nonetheless confess considerable sympathy with this view, and the conviction that this prosecution should be pursued with a substantial leavening of balance and common sense upon remand.
 
 
 
 [1]
 As will appear, the sole Miranda issue on this appeal is whether Mitchell and Brouillette were in custody during their interviews with the EPA agents. The government implicitly concedes that if the interviews were custodial, interrogation occurred. See Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689-90, 64 L.Ed.2d 297 (1980) (interrogation means "either express questioning" or a "functional equivalent" that is "reasonably likely to elicit an incriminating response"); United States v. Morales, 834 F.2d 35, 38 (2d Cir.1987) (investigative intent required). It is also not disputed that Tuttle, a special agent in the EPA Office of Criminal Investigations, is a law enforcement officer subject to the Miranda doctrine. See 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 6.10(c) (1984 & Supp.1991)