**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Sheldon SERLIN, Defendant-Appellant.**

No. 82–1460.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 21, 1983.

Decided May 19, 1983.

On Denial of Petition for Rehearing
June 24, 1983.

Michael G. Cheronis, Chicago, Ill., for defendant-appellant.

Antonio J. Curiel, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL, POSNER and COFFEY, Circuit Judges.

PELL, Circuit Judge.

Defendant appeals his conviction following a jury trial of willful failure to file income tax returns for 1976 and 1977 in

violation of 26 U.S.C. § 7203. At trial defendant objected to the admission into evidence of statements he made to various agents of the Internal Revenue Service (IRS), admission of evidence that he failed to file a return in 1978, and assorted instances of alleged prosecutorial misconduct. Defendant raises these same claims on appeal, which necessitates a detailed review of the events leading to his conviction. Prior to trial a suppression hearing was conducted by a magistrate. The district court adopted the magistrate's findings of fact, and as we cannot say that these findings are clearly erroneous we will rely upon them in reaching our decision.

*I. Facts.*

Defendant's first contact with the IRS agents came through an IRS investigation of Allen Stone, a former business associate of defendant. Special Agent Richard Lucas, assigned to the Criminal Investigation Division, was in charge of the Stone investigation. Lucas knew that defendant and Robert Koenig were business associates of Stone and was also aware that the IRS had no record of defendant filing a tax return for 1976. On May 9, 1978, with this information in mind, Lucas and Special Agent Pinta went to defendant's home, identified themselves as IRS agents, and informed defendant that they wished to ask some questions in connection with a criminal investigation of Stone. Defendant invited the agents into his home and began to describe his relationship with Stone. Agent Lucas initially told defendant that he was not the subject of any investigation, but after several minutes of conversation

warned defendant of his right not to incriminate himself. Defendant acknowledged this warning and continued to discuss his dealings with Stone. Ten to fifteen minutes later, but before defendant provided the agents with any information about his own tax affairs, Lucas read defendant the IRS noncustodial advisement of rights.[1] Lucas then began questioning defendant about defendant's apparent failure to file a tax return for 1976. Defendant stated that he filed a return for 1976 and would mail a copy to Lucas.

Lucas later obtained an updated report on defendant that confirmed that no return had been filed for 1976. Based on the information gathered by Lucas the investigation of defendant was reassigned to Special Agent Curtis Elliott, a criminal investigator with the General Program Group. Elliott opened criminal investigation files on defendant and Robert Koenig in August of 1978. Elliott first attempted to contact defendant on September 27, 1978, by visiting defendant's home. Defendant was not available and Elliott left his card with defendant's wife, explaining that he wished to speak with defendant about defendant's previous interview with Lucas. The following day Elliott received a telephone call from defendant during which Elliott asked if defendant remembered being advised of his rights by Lucas. Defendant at first replied that he did not recall this episode but then stated that he "kind of" remembered. Elliott did not reread the noncustodial rights to defendant. Elliott stated that the IRS had no record of defendant filing a return for 1976 and asked if defendant was

---

1. The advisement of rights, contained in the Internal Revenue Manual for Special Agents, reads as follows:

> As a Special Agent, one of my functions is to investigate the possibility of criminal violations of the Internal Revenue laws, and related offenses. In connection with my investigation of your tax liability I would like to ask you some questions. However, first I advise you that under the Fifth Amendment to the Constitution of the United States I cannot compel you to answer any questions or to submit any information if such answers or information might tend to incriminate you in

any way. I also advise you that anything which you say and any documents which you submit may be used against you in any criminal proceedings which may be undertaken. I advise you further that you may, if you wish, seek the assistance of an attorney before responding.

> Do you understand these rights?

> However, you may waive the right to seek the assistance of an attorney before responding. You may also voluntarily answer questions or submit information at this time, if you so desire.

willing to discuss the matter. Defendant replied that, on the advice of his attorney, he would not meet with the IRS but would have his attorney mail a copy of the return to Elliott.

On January 15, 1979, defendant called Elliott in response to a message left by the agent. Defendant declined to meet with Elliott, ostensibly because of the inclement weather, but agreed to get in touch with Elliott the next week to set up a meeting. On February 7, 1978, defendant called Elliott and left a message cancelling a meeting but assuring the agent that defendant was "not trying to dodge" him. That afternoon Elliott and Special Agent Johnson went to defendant's place of employment where they met defendant and showed him their credentials. Defendant requested that they all go to the warehouse on the first floor, and then stated that he did not wish to cooperate because of previous bad experiences with government employees. Elliott read defendant his noncustodial rights and assured him that he did not waive his rights by answering one question. Elliott informed defendant that they were investigating defendant's tax liability as well as that of Robert Koenig. Defendant claimed that he filed returns for 1976 and 1977.

Elliott later spoke with defendant at defendant's office on August 27, 1979, and reminded him of his rights. Defendant said that he was aware that he did not have to answer any questions. Defendant once again claimed to have filed his returns and then signed a waiver of notice of summons that allowed Elliott to obtain defendant's bank records. Elliott spoke with defendant on September 11, 1979, after reminding defendant that he could refuse to answer any or all questions asked. Defendant answered Elliott's inquiries about the missing returns. This scenario was repeated on December 20, 1979.

## II. Admission of Statements.

Defendant's principal contention on appeal is that the district court erred in admitting his statements into evidence. In support of this claim defendant asserts that the statements were involuntary in that they were the product of governmental deceit, the agents failure to honor his stated desire not to cooperate, and other coercive conduct by the agents. Faced with these claims it is our task to "examine the entire record and make an independent determination of the ultimate issue of voluntariness." *Beckwith v. United States,* 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976). Although our final decision will be based upon the totality of the circumstances surrounding defendant's statements, given the distinct nature of each of defendant's claims, we examine them seriatim.

### A. Deceit and Trickery.

Defendant claims that he gave the statements in the mistaken belief that he was not the subject of the investigation. This mistaken belief, he asserts, was induced by the agents repeated references to their investigation of Stone and Koenig, which served to mask the true nature of their inquiry.

To prevail on this point defendant must produce clear and convincing evidence that the agents affirmatively mislead him as to the true nature of their investigation. *United States v. Nuth,* 605 F.2d 229, 234 (6th Cir.1979); *United States v. Lehman,* 468 F.2d 93 (7th Cir.1972), *cert. denied,* 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232; *Cohen v. United States,* 405 F.2d 34 (8th Cir. 1968), *cert. denied,* 394 U.S. 943, 89 S.Ct. 1274, 22 L.Ed.2d 478 (1969). Defendant must also prove that the misinformation was material in his decision to speak with the agents. *United States v. Tonahil,* 430 F.2d 1042 (5th Cir.1970), *cert. denied,* 400 U.S. 943, 91 S.Ct. 242, 27 L.Ed.2d 247. Simple failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead. *United States v. Tweel,* 550 F.2d 297 (5th Cir.1977); *United States v. Lehman, supra; United*

States v. Prudden, 424 F.2d 1021 (5th Cir. 1970), cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62.

■ The typical deceit case involves a taxpayer who claims that his volubility was induced by assurances that the investigation was "routine" and only civil rather than criminal. Defendant's claim differs from this situation in one crucial respect. He admits that he was aware of the criminal nature of the investigation but claims that he was ignorant of his own susceptibility to penalty. In the case in which the taxpayer is told that the investigation is only civil, the nature of the questions will not reveal the true purpose of the inquiry. In evaluating defendant's claim, however, it must be borne in mind that the repeated questions concerning defendant's apparent failure to file tax returns would have alerted even the most unsuspecting taxpayer that he was, at least partly, the focus of the search. From this vantage point it becomes evident that defendant's statements were not the product of affirmative deceit.

One insurmountable obstacle in defendant's path is that the statements concerning the investigation of Stone and Koenig were true. Defendant does not seriously question this and even concedes that the investigation of his tax problems served the "dual" purpose of bringing to light the wrongdoings of his business associates. A true statement cannot be equated with affirmative deceit. United States v. Mapp, 561 F.2d 685, 689 (7th Cir.1977). In addition, although agent Lucas initially told defendant that he was not the subject of any investigation, this mistake was corrected when Lucas realized that defendant might incriminate himself a few minutes into the conversation. Ten minutes later, and before defendant gave any of the statements in question, any lingering misconception was removed by Lucas' reading of the IRS noncustodial advisement of rights, which informed defendant: "As a Special Agent, one of my functions is to investigate the possibility of criminal violations of the Internal Revenue laws, and related offenses. In connection with my investigation of your tax liability I would like to ask you some questions." (Emphasis added). These warnings, coupled with the questions concerning defendant's returns, should have alerted defendant, and beyond doubt did alert him, that he was a subject of the investigation, and certainly defeat any claim that the agents affirmatively misled defendant.

Defendant has not presented us with any other statements or action by agents Lucas and Elliott that support his claim of governmental deceit. On these facts we agree with the district court that defendant's statements were not the product of deceit or trickery.

### B. Failure to Honor Defendant's Desire Not to Cooperate.

Defendant argues that the agents were required to cease all questioning when he expressed reluctance at meeting with them or cooperating in the investigation. In support of this claim defendant cites Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1976). For reasons that are readily apparent Mosley is of little help to defendant.

■ Mosley involved application of the holding in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In both of these cases the Court was concerned about the coercive atmosphere created by custodial interrogation. The inherent coerciveness of custodial interrogation prompted the Court in Miranda to devise several safeguards of the suspect's right not to answer questions, including a requirement that the police advise the suspect that he has the right not to incriminate himself. Should the suspect exercise the right to cut off questioning the police must "scrupulously honor" this request and cease all questioning. This cease-questioning rule stems from the Court's recognition that "[w]ithout the right to cut off questioning, the setting of in-custody interrogation operates on the will of the individual to overcome free choice in producing a statement after the privilege has once been invoked." 423 U.S. at 100–01, 96 S.Ct. at 324–25 (quoting

*Miranda v. Arizona,* 384 U.S. at 473–74, 86 S.Ct. at 1627) (emphasis added).

■■■ In contrast to the presumption of coercion that attends statements given during custodial interrogation in the absence of *Miranda* warnings, statements made during a noncustodial interrogation are not viewed with suspicion. In *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), the Court relied upon this difference in rejecting the argument that IRS agents must advise a suspect of his *Miranda* rights during a noncustodial interrogation. The Court, however, recognized that "noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.'" 425 U.S. at 347–48, 96 S.Ct. at 1616–17 (quoting *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961)). Unlike our review of custodial interrogation, in which it is our duty to determine whether the police "scrupulously honored" a request to cease questioning, in reviewing noncustodial interrogation our duty is "to examine the entire record and make an independent determination of the ultimate issue of voluntariness." 425 U.S. at 348, 96 S.Ct. at 1617 (quoting *Davis v. North Carolina,* 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966)).

Although the "scrupulously honor" test is not our guide in this case, we will consider the agents' persistence in questioning defendant in the face of his stated desire not to cooperate. This is, however, but one factor in determining the voluntariness of defendant's statements. As defendant has also raised a more general claim of coercion by the agents we will review all of the relevant factors together.

## C. Coercion in Obtaining Statements.

■■ Defendant claims that the record evidences the "special circumstances" alluded to in *Beckwith* that render a noncustodial statement involuntary. Although there is some indication that agent Elliott questioned defendant on February 7, 1979, despite defendant's reluctance at cooperating with government officials, this alone does not compel the conclusion that defendant's subsequent answers were coerced, and obviously has no bearing on the voluntariness of defendant's earlier statements. Other than Elliott's persistence on this one occasion we find no evidence of coercion by the agents.

The first interview conducted by Lucas took place in defendant's home. Defendant expressed no reluctance at speaking with the agents and the meeting was cordial. The agents informed defendant of his rights when they realized that their investigation of Stone might implicate defendant. Subsequent meetings with defendant were no more coercive than the first. Agent Elliott's first "contact" with defendant was actually only a short meeting with defendant's wife. Furthermore, when defendant first spoke with Elliott he stated that he would not meet with the IRS but would mail a copy of his return to Elliott. This conversation indicates, if anything, that defendant was capable of saying "no" to Elliott rather than that the agent had overborne defendant's will. Elliott did not contact defendant again until January of 1979. Even in a custodial interrogation Government agents may renew a request to talk with a suspect after a lapse of time since the suspect's initial refusal. *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1976). We do not find Elliott's renewal of his request to meet with defendant four months after defendant refused to meet him coercive. Defendant agreed to meet with Elliott, but postponed the meeting "because of the weather." Contrary to defendant's suggestion, we do not believe that Elliott should have read this excuse as a veiled assertion of defendant's right not to cooperate. Defendant also suggests that when he cancelled a meeting on February. 7, 1979, the agents should have realized that he did not wish to cooperate. This ignores defendant's assurance that he was "not trying to dodge" Elliott. It cannot be said, then, that Elliott's visit to defendant's place

of employment that afternoon was unjustified or coercive.

Defendant was advised of his rights during the first interview, was reminded of them during the second, and was re-advised of them during the last three interviews. Furthermore, there is no evidence of threats or promises by the agents nor any other indication of actions that might overbear defendant's will. Defendant was an intelligent man aware of his rights and capable of saying "no" to the agents. The interviews took place over a long period of time with plenty of opportunity for defendant to reflect upon the requests for information and to obtain legal advice, which he did at least once. Based on these facts, Elliott's repeated questioning of defendant on February 7 did not render the subsequent statements involuntary.

### III. Failure to File 1978 Return.

During trial the prosecution presented evidence that defendant failed to file a return for 1978 as well as for the years covered by the indictment. Defendant objected to the evidence on the grounds that its probative value was outweighed by its prejudicial impact and on the novel contention that "in light of the other overwhelming evidence of willfulness available to the prosecution, the admission of *this* evidence amounts to prosecutorial 'overkill' and violated defendant's right to due process and a fair trial."

■ Proof of other wrongs committed by a defendant is not admissible to show that he is a congenital evildoer and therefore guilty of the crime charged, but it is admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). Evidence relevant under Rule 404(b) may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. The balancing of probative value and unfair prejudice is within the

trial court's discretion and its decision must be accorded great deference. *United States v. Vincent,* 681 F.2d 462 (6th Cir.1982); *United States v. Baskes,* 649 F.2d 471, 481 (7th Cir.1980), *cert. denied,* 450 U.S. 1000, 101 S.Ct. 1706, 68 L.Ed.2d 201 (1981). Proof of a taxpayer's failure to file a return prior or subsequent to the years in question has been consistently held relevant to the issue of willfulness. *United States v. Farris,* 517 F.2d 226, 229 (7th Cir.1975), *cert. denied,* 423 U.S. 892, 96 S.Ct. 189, 46 L.Ed.2d 123; *United States v. Ming,* 466 F.2d 1000, 1009 (7th Cir.1972), *cert. denied,* 409 U.S. 915, 93 S.Ct. 235, 34 L.Ed.2d 176.

■ We cannot say that the trial judge abused his discretion in determining that the probative value of defendant's failure to file a return in 1978 outweighed any unfair prejudice it might cause.[2] Defendant's failure to file a return in 1978 is indicative of a conscious plan to evade taxes and hence proves that the earlier failures were also the product of a willful design. We note that the Government is in a "heads we win, tails you lose" situation in these cases as evidence that defendant filed returns prior or subsequent to the years in question would also be admissible as it proves that he was aware of the duty to file. *United States v. Farris,* 517 F.2d at 229. While this seeming inconsistency may detract from the probative value of the evidence it does not mandate its exclusion. In this case, as in *Ming* and *Farris,* the probative value is increased by the fact that the subsequent wrong proved, failure to file a return, was identical to the charged offenses and by the fact that there was no hiatus between the acts.

We turn briefly to defendant's claim of prosecutorial "overkill." While the availability of other evidence of defendant's guilt may be relevant under Rule 403 in determining whether to admit questionable evidence, there is no independent right to limit the amount of evidence the prosecution may

---

2. Defendant's assertion that the judge failed to make the balancing test is simply a misstatement of the record. The judge explicitly stated

that he found the possible prejudice outweighed by the probative value.

present. Evidence of guilt, while it undoubtedly works to the detriment of the accused, is not unfairly prejudicial. Furthermore, even accepting that there is such a right, it seems by definition that any violation would be harmless error. In short, to the extent that we understand defendant's argument we find it unconvincing.

### IV. Prosecutorial Misconduct.

Defendant has presented us with a host of alleged instances of prosecutorial misconduct. We will not extend this opinion by reviewing all of these, but suffice it to say that we find no merit in those contentions not discussed.

█ Defendant complains that the prosecutors misstated the evidence during opening statement and closing argument by stating that defendant admitted not filing a return for 1978 when in fact defendant testified that he could not remember what he did with his 1978 return. We have been unable to find any statement to this effect in the opening statement. During closing argument the prosecutor did incorrectly state that defendant admitted not filing his return for 1978, but this came directly after the prosecutor correctly reviewed defendant's claim of lapsed memory and, in any event, was promptly corrected by the trial judge. While we do not condone misrepresentations of the evidence, and we have no reason for thinking this was intentional here, it does not warrant a new trial.

█ During trial, copies of returns allegedly filed by defendant were introduced into evidence. Defendant's wife, whose signature appeared along with her husband's, testified that she had not signed the return and did not recognize the handwriting, although she did recognize her husband's signature. The prosecutor argued that defendant had someone else sign his wife's name and that this was further proof of willfulness. Defendant argues that this "is not even *close* to a permissible inference." We are at a loss to understand why this is not a permissible inference. If defendant's wife did not sign the return then someone else did, and probably with defendant's knowledge. The inference is not only permissible, it is compelling.

█ Finally, defendant objects that the prosecutor interjected his own beliefs into the case by stating that "Based on all the evidence and circumstances we strongly feel that this case . . . ." Defendant objected before the prosecutor stated what his belief was. The prosecutor's slip of the tongue, which was corrected before any damage was done, does not justify a reversal of defendant's conviction.

For the foregoing reasons, defendant's conviction is AFFIRMED.

### On Petition for Rehearing

█ This matter is before the court on defendant-appellant's *pro se* petition for rehearing. It raises only three points, none of which were addressed in the appellant's brief or oral argument and which in essence, seek to assert incompetence of trial counsel. Whatever appellant's remedies may be on this score, they are not now properly brought before this court on a petition for rehearing.

We accordingly deny the petition for rehearing.

We also note that appellant simultaneously filed a motion for appointment of counsel, presumably seeking a replacement of appointed counsel who had represented him on appeal, and a motion for extension of time. Both are dependent on an issue being raised by the petition for rehearing which we are persuaded has not been accomplished.

Accordingly, we deny the latter two motions.

IT IS SO ORDERED.