FLOYD, Circuit Judge:
Appellant Master Giddins was convicted of bank robbery and conspiracy to commit bank robbery following a jury trial. Part of the evidence used at trial was a videotaped statement Giddins gave to police during the investigation into the crime. On appeal, Giddins argues that the statement was coerced, and that he did not voluntarily waive his Fifth Amendment rights. We agree, and find that harmless error cannot save the conviction in light of this constitutional trial error. As a result, we reverse Giddins’s conviction. We need not address the additional issues Giddins has raised regarding sentencing.
I.
A.
Over the course of three days in September 2013, three different bank robberies were committed in and around Baltimore, Maryland. The first robbery occurred on September 25, 2013, when someone wearing women’s clothing and a black wig entered the M& T Bank in Baltimore, Maryland. That person handed the teller a note stating that the person had a bomb, and demanded that money be placed into a black and white polka dot cosmetic bag, which was handed to the teller. After obtaining the money, the robber fled the bank, was driven away in a waiting vehicle, and discarded a GPS tracker the teller had placed in the bag, to which wig fibers were attached. Police later determined that the robber was Appellant Master Giddins, that the getaway car was his silver Ford Focus, and that the getaway driver was Czekiah Fludd.
The next day, September 26, 2013, Gid-dins lent his car to Fludd and Ashley Fitz, whom Giddins was dating at the time. Fitz and Fludd drove to an Exxon station to obtain blank lottery tickets, on which one *875 or both of them wrote a note similar to the note used in the September 25th robbery. They then drove to the First Mariner Bank in Owing Mills, Maryland, where Fitz entered the bank wearing a black wig and carrying a black and white polka dot cosmetic bag. After handing the bag and note to a teller, Fitz was given cash, and then ran from the bank. A construction worker saw Fitz and Fludd get into Gid-dins’s car, and the Exxon station recorded the pair on video obtaining the blank lottery tickets.
The following day, September 27, 2013, Giddins again lent his car to Fitz and Fludd. They, along with a third person, Alexis Chandler, robbed the Baltimore County Savings Bank in unincorporated Baltimore County, Maryland. Fitz and Chandler both entered the bank wearing wigs, gave notes that they had a bomb, and demanded money. Fitz was given a dye pack along with her money, which exploded on the way back to the car. Fitz threw the bag out of the window, and additional items were discarded. When the three women went back to try to obtain the bags, they were stopped for matching the description of the bank robbery suspects. They were ultimately arrested, and the car was seized.
After their arrest, Fitz and Chandler provided statements to the police and admitted involvement in the September 27th robbery. Fitz additionally admitted to participating in the September 26th robbery and implicated Giddins. Fitz told police that the September 26th robbery was committed using Giddins’s car, that Giddins had been present when both robberies were planned, and that Giddins had been involved in the September 25th robbery.
Based on the statements and evidence, Detective William Taylor of the Baltimore City Police Department applied for and obtained a warrant for Giddins’s arrest from a Commissioner of the District Court of Maryland for Baltimore City. See Gov’t Suppl. Authority Ltr., Attach. 1, ECF No. 65-2 [hereinafter, the “Warrant”]. The Warrant was issued on October 3, 2013 at 10:20 am. Id.
B.
On or about October 4, 2013, Giddins was informed by Baltimore County Police that they had his car and that it had been used in a bank robbery. On the morning of October 4th, Giddins went to Baltimore County Police headquarters in order to retrieve his car. Upon arrival, Giddins was taken to an interview room by Detective Steve Morano of Baltimore County Police Department and an unknown member of the department. Giddins’s interactions with police officers from the time he entered the interrogation room were recorded on video.[1] The interrogation room was set up with an oblong, almost rectangular table on the side of the room with one long end of the table against the wall; there was one chair per free side of the table, Giddins was seated on one of the short sides, and Det. Morano sat on the long side. There were also two doors to the room—one immediately behind Giddins within his arm’s reach, and one approximately five *876 feet behind Det. Morano, outside the camera’s view.
1.
After entering the room at 10:17:35 am and sitting down, Det. Morano copied down Giddins’s license information. At 10:17:58, the unknown member of the department left the room through the door behind Giddins, which was also the door through which the three had entered the room. Upon leaving, he audibly locked the door, causing Giddins to turn his head toward the door.
Det. Morano asked Giddins to whom he lent his car, and Giddins replied that he lent it to Fludd. Det. Morano informed Giddins that Fludd was locked up, and continued asking details about when and why Giddins lent Fludd his car, the frequency with which Giddins would lend Fludd his car, and whether Fludd was going through any hard times. At 10:20:55, Giddins asked Det. Morano, “Am I in trouble?” to which Det. Morano replied, “No, you’re here getting your car right?” and went on to explain that he was taking notes for a report because the car was used in a crime. At 10:21:25, Det. Morano got up to leave and informed Giddins that he had to complete some paperwork and would be right back. After checking that the door behind Giddins was in fact locked, Det. Morano left through the second door.
At 10:22:56, Det. Taylor from Baltimore City Police entered the room through the second door, explained that Det. Morano had become busy with something else, and that Det. Taylor would- be taking over.[2] Det. Taylor sat down in the seat vacated by Det. Morano, and began going over the same biographical information with Giddins. At 10:23:31, “Mr. Kim” entered the room, purportedly as a trainee detective observing the situation, and sat down at the remaining seat at the other short end of the table opposite Giddins.[3] Det. Taylor then continued asking Giddins biographical information. Giddins asked if he could take a call at 10:27:02, and Det. Taylor told him that he could, but that it needed to be “real quick” and then everyone was going to “put their phones up.” At 10:27:25, Det. Taylor placed his phone on the table and indicated that Giddins should do the same. Giddins put his phone on the table by him, and Det. Taylor picked it up, moving both of their phones to the end of the table farthest from Giddins and closest to Kim. Giddins phone began ringing again at 10:27:42, and Det. Taylor handed the phone back to Giddins, but told him to “go ahead and turn it off for a couple of minutes.”
Det. Taylor produced a Miranda[4] waiver around 10:28:12 and told Giddins that they had to read him his rights because, his car was involved in a crime. He told Gid-dins, “It doesn’t mean you’re under arrest, it doesn’t mean you’re being charged with anything. But since we’re asking you questions, by law we have to read you your rights, OK? (pause) I’m kind of interested to find out what’s going on with these three young ladies who decided to use your car in a crime.” Det. Taylor passed the Miranda waiver to Giddins at 10:28:46 and instructed him, “What I want you to do is read each one out loud to me, stop at the end of each one. If you understand what it says, write the word ‘yes’ and put *877 your initials next to it. If you have any questions, you can ask me, OK?” Giddins then began reading each right aloud, and when he confirmed that he understood, Det. Taylor instructed him to write “yes” next to the statement.
At the bottom of the form, after reading each individual right, the form required a full signature after the statement, “I have been advised of and understand my rights. I freely and voluntarily waive my rights and agree to talk with police without having an attorney present.” Det. Taylor asked at 10:30:31, “You don’t have any questions with us asking about your car, do you?” Giddins responded, ‘Tes. Is this the procedure for me to get my car back? Like—cause I feel like—,” and Det. Taylor responded, ‘Yeah, we do, but like I said, your car was used in crimes that we need to—we need to dig in and find out what’s going on with your—with these three girls, what your relation with them is, how they came in contact with your car, all that stuff.” Giddins replied that he understood, and Det. Taylor asked, “Do you mind explaining all that stuff to us?”
After then stating that he “d[id]n’t know any of that stuff,” Giddins asked at 10:30:36, “That’s what I’m asking, like, is this, like, the procedure for me to get my car back?” to which Det. Taylor responded, “Yeah—in order for us to ask you questions, because the vehicle was used in a crime, by law, we have to go over these rights. If we start asking you stuff and you don’t want to talk to us, then don’t talk to us. But we’re just trying to figure out some issues.” Giddins asked again, “But do I still get my ear?” and Det. Taylor responded, “Before I release the car to you, I would like to know some answers.... I would like to know some answers before we release your car back to you.” Giddins said, “That’s what I’m asking,” and then Det. Taylor told him, “We’ll explain everything to you.”
Giddins then asked Det. Taylor, “I’m not in trouble or anything, am I?” Det. Taylor answered, “Not at this point, no. We’ll find out what’s going on. So long as you don’t have—you know—you don’t sit there and tell me you were hiding in the trunk and you escaped when the police pulled them over, no. Right? You weren’t hiding in the trunk, were you?”
When Giddins smiled and shook his head, Det. Taylor said, “Then what do you have to worry about?” Giddins said, “I don’t have anything to worry about, I just don’t like how I feel like I’m being interrogated—and y’all just—” and Det. Taylor interrupted, “You’re not being interrogated, you’re free—” to which Giddins interjected, ‘You gotta understand what I’m saying.” Det. Taylor told him, “I know, I understand you, you’re nervous. Because your car was used in a crime. I’d be nervous, too.”
Giddins then said, “I didn’t do anything, and it’s like—” and Det. Taylor interrupted again, “Did I say you did anything?” Giddins responded, “No, I’m like, I’m in a closed room, two guys are here, they locked the doors—” and Det. Taylor, indicating to the door behind him and farthest from Giddins, replied, “The doors aren’t locked, the doors are wide open.” Giddins then grabbed the door handle immediately behind him and showed how the knob was locked. Det. Taylor said, “Well that one is. You can’t get in on the other side of that door. Why you think we have to come in that door?” indicating to the one unlocked door. Giddins said, “But you understand what I’m saying?” Det.' Taylor retorted, “Are you handcuffed?” Giddins responded, “No, but you understand—” and Det. Taylor said, “Oh, I understand you.” Giddins then signed the Miranda waiver at 10:32:10.
*878 2.
During the next fifteen minutes, the questioning continued. Det. Taylor asked Giddins about where he was during each of the three robberies, his relationship with Fludd, Fitz, and Chandler, and other topics. Giddins responded that he was meeting with his parole officer during the September 25th robbery. Det. Taylor periodically asked questions that required Gid-dins to look at his phone, and each time after Giddins finished, Det. Taylor instructed him to put his phone back up and away from him. Giddins also told Det. Taylor that he had been in trouble at work two days previously for using his phone while at work. Additionally, Giddins told Det. Taylor that he had been off from work on September 23rd and 24th, but at work on September 25th.
Finally, at 10:47:31, Det. Taylor showed Giddins a surveillance photo of the robber from the September 25th robbery and told Giddins that he was the robber. When Giddins denied that, Det. Taylor laid out the case for why he suspected Giddins of bank robbery. At 10:50:00, Giddins invoked his Fifth Amendment right to counsel by stating, “No further questions,” and asking for a lawyer, at which point questioning immediately ceased. Det. Taylor seized Giddins’s cell phone at 10:50:06, prying it from Giddins’s hands and telling him “I’ll take that.” At 10:50:09, Det. Taylor formally informed Giddins that he was under arrest for bank robbery. At 10:50:15, Det. Taylor cuffed Giddins, and at 10:50:36, Det. Morano re-entered the room through the previously locked door. Giddins was taken out of the interrogation room to be taken to Baltimore City jail at 11:11:37, at which point the videotape stops.
C.
Giddins was indicted by a federal grand jury in the District of Maryland on three counts of unarmed bank robbery, in violation of 18 U.S.C. § 2113(a) and (f), and one count of conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371. Gid-dins moved to suppress the statements given to police before trial began. A hearing was held at the start of the trial before jury selection began, and the district court denied the suppression motion by written memorandum opinion. See United States v. Giddins, 57 F.Supp.3d 481 (D. Md. 2014).[5]
During the course of trial, the video was played for the jury, and the government referred to the video and the statements Giddins made in it during both opening statement and closing argument. The jury convicted Giddins on one count of bank robbery for robbing the M&T Bank on September 25th and one count of conspiracy to commit bank robbery, but acquitted him of the other two bank robbery counts. Giddins timely noted this appeal following his sentencing, and we have jurisdiction pursuant to 28 U.S.C. § 1291.
II.
“When reviewing the district court’s denial of a motion to suppress, we *879 review factual findings for clear error and the legal determination that the statement was voluntary de novo.” United States v. Holmes, 670 F.3d 586, 591 (4th Cir. 2012) (citing United States v. Mashburn, 406 F.3d 303, 306 (4th Cir. 2005)). “A confession made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the defendant knowingly, intelligently, and voluntary waives those rights.” Holmes, 670 F.3d at 591 (citing United States v. Guay, 108 F.3d 545, 549 (4th Cir. 1997)).
III.
Although Giddins frames the issue in his appeal primarily as whether the statements were voluntary, and discusses the voluntariness of the Miranda waiver only secondarily, in actuality it is the Miranda waiver issue that is decisive in this case. Indeed, all arguments by both Gid-dins and the government are directed toward the remarks made by police in the immediate timeframe of the Miranda waiver. Although Giddins argued below that the pre-waiver statements were also involuntary, that argument is not clearly raised before us here. Further, most of the pre-waiver statements appear to be regarding simple biographical booking information, to which no special concerns under the Fifth Amendment apply. See Pennsylvania v. Muniz, 496 U.S. 582, 601, 110 S.Ct. 2638,110 L.Ed.2d 528 (1990).
A.
Concerns under Miranda only arise when a defendant is in custody and subjected to interrogation. Montejo v. Louisiana, 556 U.S. 778, 794, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009); see also Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (“[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.”). The parties do not dispute that Giddins was subject to interrogation. Therefore, the issue of whether Miranda applies turns on whether Giddins was in custody.
The government first submits that Giddins was never in custody prior to his formal arrest, so no warnings under Miranda were even necessary. We disagree. “When deciding whether a defendant not under formal arrest was in custody—and thus if the Miranda requirements apply—a court asks whether ‘under the totality of the circumstances, a suspect’s freedom of action was curtailed to a degree associated with formal arrest.’ ” United States v. Hashime, 734 F.3d 278, 282 (4th Cir. 2013) (quoting United States v. Parker, 262 F.3d 415, 419 (4th Cir. 2001)) (further internal quotation marks and alterations omitted). It is an objective inquiry, and essentially asks “whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.” Id. at 282-83 (internal quotation marks, alterations, and citations omitted). This determination “calls for application of the controlling legal standard to the historical facts.... [and thus] presents a ‘mixed question of law and fact’ qualifying for independent review.” Thompson v. Keohane, 516 U.S. 99, 112—13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). “Facts relevant to the custodial inquiry include, but are not limited to, ‘the time, place and purpose of the encounter, the words used by the officer, the officer’s tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant.’ ” Hashime, 734 F.3d at 283 (quoting United *880 States v. Day, 591 F.3d 679, 696 (4th Cir. 2010)).
In concluding that Giddins was not in custody, the district court made findings of fact to support that conclusion:
Giddins voluntarily entered the police station to obtain the return of his car. Giddins was not in handcuffs, and one door was unlocked. Two investigators were present; one asked questions while the other remained silent. No weapons are visible in the recorded interview. Detective Taylor’s tone was nonthreatening. Although an arrest warrant had issued, Giddins was apparently unaware of this fact and, thus, it does not alter the objective inquiry.
Giddins, 57 F.Supp.3d at 489 (citations omitted).
These findings are not clearly erroneous, and thus guide this appeal. However, the findings of the district court are not complete on this, and fail to paint the full picture. It is true that one door was unlocked in the interrogation room, but it was the door past the questioning detective. The door immediately behind Giddins was locked, so in order to leave the room, Giddins would have had to walk past Det. Taylor. Additionally, at least twice during the interrogation, Det. Taylor moved Gid-dins’s phone away from Giddins. Although Det. Taylor did tell Giddins that he was free to leave, “such a statement ‘is not talismanic or sufficient in and of itself to show a lack of custody.’” Hashime, 734 F.3d at 284 (quoting United States v. Hargrove, 625 F.3d 170, 180 (4th Cir. 2010)).
Finally on the custody inquiry, there is the issue of Giddins’s car. The district court rejected the argument, repeated here on appeal, that Giddins was not able to leave the interrogation room because he believed that if he terminated the interview, he would not have his car returned to him. The court found “[t]hat Giddins may have believed that terminating the interview would prevent the return of his car does not mean that Giddins felt unfree to leave.” Giddins, 57 F.Supp.3d at 489. We find that this is a distinction without a difference.
As stated above, the custody inquiry is an objective one and does not consider “the subjective views harbored by either the interrogating officers or the person being questioned.” J.D.B. v. North Carolina, 564 U.S. 261, 271, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011) (internal quotation marks and citations omitted). We must still, however, consider how a reasonable person would have understood the situation. The purpose of not considering subjective views is to “avoid[] burdening police with the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular traits affect each person’s subjective state of mind.” Id. (citations omitted). Keeping this in mind, we fail to see how a reasonable person would have perceived the situation as permitting him or her to leave the room freely. A reasonable person would have felt unable to cease the interview and thus forfeit the opportunity to obtain the return of his or her property. As we explain in more- detail in Section III.B.l, infra, Gid-dins’s car was essential to his livelihood and something he needed returned to him. Considering the totality of the circumstances,[6] Giddins was in custody, and Mi *881 randa warnings were required for any non-booking questions.
B.
Having concluded Miranda warnings were necessary, we now turn our attention to the Miranda waiver. Giddins submits that both the questioning and waiver were involuntary and the result of coercion. We agree.
Coercive police activity is .a necessary finding for a confession or a Miranda waiver to be considered involuntary. United States v. Cristobal, 293 F.3d 134, 140-141 (4th Cir. 2002) (citations omitted). “The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary. The proper inquiry is whether the defendant’s will has been overborne or his capacity for self-determination is critically impaired.” United States v. Braxton, 112 F.3d 777, 780-81 (4th Cir. 1997) (en banc) (internal quotation marks and citations omitted). “The Government bears the burden of proving by a preponderance of the evidence that the statement was voluntary.” Braxton, 112 F.3d at 781 (citing Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972)). Having reviewed the record, we conclude that the government failed to meet its burden here, and that the district court erred in concluding otherwise.
“[Coercion can be mental as well as physical, and the blood of the accused is not the only hallmark of an unconstitutional inquisition.” Arizona v. Fulminante, 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (quoting Blackburn v. Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960)) (internal quotation marks and alterations omitted). There are two problems here: (1) the police made it appear that if Giddins did not answer their questions, he would not be able to get his car back; and (2) Det. Taylor lied to Giddins when Giddins directly asked if he was in trouble. We address each in turn.
1.
Giddins argues that the police engaged in economic coercion by forcing him to “choose between surrendering his Fifth Amendment rights or incurring adverse economic consequences.” Appellant’s Br. at 14. He bases his argument on two Supreme Court cases: Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), and Lefkowitz v. Cunningham, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977). The government argues that these two cases are distinguishable from Giddins’s situation and do not have the far-reaching consequences that Giddins urges us to accept here.
In Garrity, four police officers were investigated in relation to allegations of ticket fixing in certain boroughs of New Jersey. 385 U.S. at 494, 87 S.Ct. 616. Each officer was informed that if he invoked his privilege against self-incrimination, then he would be subject to removal from office pursuant to state statute. Id. The officers answered the questions, and “[o]ver their objections, some of the answers given were used in subsequent prosecutions for conspiracy to obstruct the administration of the traffic laws.” Id. at 495, 87 S.Ct. 616. They appealed, arguing that the statements were coerced “by reason of the fact that if they refused to answer, they could *882 lose their positions with the police department.” Id.
The Court in evaluating the situation held that the statutory scheme was coercive:
The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice, like interrogation practices we reviewed in [Miranda, 384 U.S. at 464-65, 86 S.Ct. 1602,] is “likely to exert such pressure upon an individual as to disable him from making a free and rational choice.” We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions.
Garrity, 385 U.S. at 497-98, 87 S.Ct. 616 (footnote omitted). The Court went on to remark that “there are rights of constitutional stature whose exercise a State may not condition by the exaction of a price.... We now hold the protection of the individual ... against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office.... ” Id. at 500, 87 S.Ct. 616.
A decade later, in Cunningham, a similar situation arose. Under New York law, a political party officer was required to testify about the conduct of his or her office, and failure to do so would result in immediate termination and a five-year prohibition on holding any other party or public office. Cunningham, 431 U.S. at 802-803, 97 S.Ct. 2132. A party officer was subpoenaed to appear before a grand jury that was investigating his conduct while holding unsalaried party positions. Id. at 803, 97 S.Ct. 2132. He appeared and refused to sign a waiver of immunity which included a Fifth Amendment waiver, and as such was immediately divested of his party offices and subject to a five-year ban on holding any public or party office. Id. at 803-04, 97 S.Ct. 2132.
The Court explained that its prior cases up until that point “ha[d] established that a State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself.” Id. at 805, 97 S.Ct. 2132. The Court found that the case law was settled “that government cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized,” concluding that “the touchstone of the Fifth Amendment is compulsion.” Id. at 806, 97 S.Ct. 2132. In evaluating whether or not the law was improperly coercive, the Court considered reputational damage to the official and the loss of “potential economic benefits realistically likely of attainment” by the official should he refuse to testify, finding that each provided an independent basis for finding the law coercive. Id. at 807, 97 S.Ct. 2132. As such, the Court found the state law unconstitutional. Id. at 808-09, 97 S.Ct. 2132.
Giddins here argues that Garrity and Cunningham control, because the police threatened to indefinitely retain his car if he failed to sign the Miranda waiver and answer their questions. The government argues contrarily that a delay in returning Giddins’s car is not the equivalent of the threatened economic coercion in Garrity and Lefkowitz; however, we cannot agree. We must consider the realities of the circumstances, and compare apples to apples. No one contends that Giddins was enjoying a position of public trust such as the officers in Garrity or the political party official in Cunningham. But we cannot consider the threatened economic con *883 sequences to Giddins as being any less severe simply because Giddins may not have held as “prestigious” of a position. Giddins relied on his car to get him to his job, and it was the means of maintaining his livelihood.[7] The threatened economic consequences for him were just as great as the threatened consequences to the police officers in Garrity and the political party official in Cunningham.
When Giddins asked whether filling out the Miranda waiver and answering the officers’ robbery-related questions was the normal procedure for obtaining his car, Det. Taylor answered in the affirmative. It does not matter that Det. Taylor’s answer included a truthful statement—that in order to question Giddins they needed him to sign the Miranda waiver. What matters is how a reasonable person would have understood the responses to the questions asked; Det. Taylor’s responses indicated that if Giddins failed to sign the Miranda waiver and answer questions, Giddins would not have had his car returned to him. As such, it was unduly coercive.
2.
Giddins next argues that the officers engaged in unfair coercion by lying to him about whether or not he was in trouble during the course of the interview. The government submits that Det. Taylor never lied to him, but merely omitted the full story. We think the government draws too fine a line between what is permitted and what is not, and we agree with Giddins that Det. Taylor’s actions were improper.
“Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within Miranda’s, concerns.” Illinois v. Perkins, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (citations omitted). Indeed, there is “no duty to advise [a defendant] of the identity of the specific offense under investigation.” Braxton, 112 F.3d at 784 (citations omitted).
However, as our sister circuits have acknowledged, “failure to inform [a] defendant that he was the subject of the investigation ... [when the] defendant inquired about the nature of the investigation and the agents’ failure to respond was intended to mislead” results in affirmative deceit. United States v. Serlin, 707 F.2d 953, 956 (7th Cir. 1983) (citations omitted); see also United States v. Erekson, 70 F.3d 1153, 1158 (10th Cir. 1995) (relying on Serlin and finding that the officer “truth- *884 folly responded to [the defendant’s] inquiry into the nature of the investigation” and the defendant “did not become a focus of the investigation until two months after the interview”); United, States v. Mitchell, 966 F.2d 92, 100 (2d Cir. 1992) (relying on Serlin and finding the EPA agents in question did not mislead about the criminal nature of the investigation); cf. United States v. Olmstead, 698 F.2d 224, 226-27 (4th Cir. 1983) (finding no misstatement when the officer “refused to give assurances that [the defendant] would not become a target [of the investigation] in the future”). In order to prevail on such a claim, the “[defendant must ... prove that the misinformation was material in his decision to speak with the [police],” and “produce clear and convincing evidence that the [police] affirmatively misl[ed] him as to the true nature of their investigation.” Serlin, 707 F.2d at 956 (citations omitted).
Giddins inquired twice whether he was in trouble—first to Det. Morano while Det. Morano was taking notes, and later to Det. Taylor when Giddins was presented with the Miranda waiver. Det. Morano responded, “No, you’re here getting your car, right?” Video at 10:20:58. Det. Taylor told him, “Not at this point, no.” Video at 10:31:10. The government argues that these responses by the officers were truthful.[8] The government further suggests that “[h]ad Giddins asked if the police were planning to arrest him, the officer would have been obliged to answer yes.” Appel-lee’s Br. at 20. The government urges us to reach this conclusion on the basis that Giddins had not been formally arrested at the time Giddins inquired as to whether he was in trouble. This stretches the definition of “trouble” too far, and too narrowly distinguishes the case law.
At the time Det. Taylor entered the room, he had an arrest warrant in hand for Giddins. More to the point, Det. Taylor was the affiant on that warrant. And as acknowledged by the government, there is no evidence in the record to suggest that Det. Taylor was not going to execute that arrest warrant during his interview with Giddins. See Oral Argument at 21:27, 23:18, United States v. Giddins, No. 15-4039, (4th Cir. argued Jan. 25, 2017), http://coop.ca4.uscourts.gov/OAarchive/mp 3/15-4039-20170125.mp3.
We have no doubt that Giddins was “in trouble” when he asked both Det. Morano and Det. Taylor whether he was. The fact that an arrest warrant existed for Giddins and that Det. Taylor knew about and possessed the warrant meant that Giddins was, in fact, “in trouble” from the moment he walked into the police station. And the government has not produced evidence sufficient to carry its burden that would suggest that Det. Morano was not aware of the warrant. Once an arrest warrant issues, there is no question that the person named in that arrest warrant is “in trouble.” Therefore, there can be no question that Det. Morano and Det. Taylor affirmatively misled Giddins as to the true nature of the investigation by failing to inform him that he was the subject of the investigation. This form of deceit thus constitutes coercion.
*885 3.
It is not enough, however, to simply find coercion. As mentioned above, the coercion must rise to a level such that “the defendant’s will has been overborne or his capacity for self-determination critically impaired.” Braxton, 112 F.3d at 780 (internal quotation marks and citations omitted). “We conduct this review by considering ‘the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation.’ ” Holmes, 670 F.3d at 592 (quoting Braxton, 112 F.3d at 781).
We concluded in Section III.B.l, supra, that Giddins was in custody, although not subject to formal arrest at the time of the interview. Further, the interview took place in a police station under false pretenses that Giddins was required to submit to questioning in order to have his vehicle returned to him, and that he was not “in trouble.” Although the interview was of short duration, the setting and details of the interrogation give us grave concerns.
The government argues that Gid-dins was not new to the criminal justice system, having garnered a number of previous convictions,[9] and that he therefore knew about Miranda, his rights, and how to invoke his Fifth Amendment right to silence and right to counsel. Giddins’s background and experience is relevant to the totality of the circumstances, but the test is precisely that—one of totality. And evaluating the entirety of the interview and the conditions under which Giddins was encouraged to waive his rights under the Fifth Amendment pursuant to Miranda, we believe the police coercion was sufficient to rise to the level such that Giddins’s will was overborne or his capacity for self-determination critically impaired.
Accordingly, we conclude that Giddins’s Miranda waiver and statements were involuntary and the result of police coercion.
C.
Having found Giddins’s statements to the police involuntary, we evaluate the conviction for harmless error as a constitutional trial error. Fulminante, 499 U.S. at 295, 308, 111 S.Ct. 1246. “In assessing whether a constitutional error was harmless, we determine whether the admission of the statement as issue ‘was harmless beyond a reasonable doubt, such that it is clear that a rational fact finder would have found the defendant guilty absent the error.’ ” United States v. Watson, 703 F.3d 684, 698 (4th Cir. 2013) (quoting United States v. Poole, 640 F.3d 114, 119—20 (4th Cir. 2011)) (alterations omitted). “The test ... is not whether laying aside the erroneously admitted evidence there was other evidence sufficient to convict beyond a reasonable doubt ..., but, more stringently, “whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.’ ” Thompson v. Leeke, 756 F.2d 314, 316 (4th Cir. 1985) (quoting Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)).
The Court in Fulminante identified three considerations in finding whether admission of statements given by a *886 defendant in violation of the Fifth Amendment would survive harmless error: (1) the importance of the statement to the government’s case; (2) the impact on credibility of other evidence; and (3) the admission of prejudicial evidence based solely on the admission of the statement. See 499 U.S. at 297-300, 111 S.Ct. 1246. We review the record de novo to determine “whether the [government] has met its burden of demonstrating that the admission of the [statements] did not contribute to [the defendant’s] conviction.” Id. at 295-96, 111 S.Ct. 1246 (citing Chapman v. California, 386 U.S. 18, 26, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).[10]
The government has failed to meet its burden here, arguing the incorrect test and merely citing to the other evidence in the case as overwhelming.[11] In Thompson, we made explicit that even when the other evidence introduced in the case was sufficient to convict beyond a reasonable doubt, we impose a higher burden and a concomitantly more exacting test to determine whether a constitutional error was harmless. See Thompson, 756 F.2d at 316 (noting that if the test were simply looking to the other evidence, that test would “undoubtedly be met,” but affirming reversal of conviction under the stricter standard derived from Chapman); see also United States v. Dominguez Benitez, 542 U.S. 74, 81 n.7, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) (“When the Government has the burden of addressing prejudice, as in excusing preserved error as harmless on direct review of the criminal conviction, it is not enough to negate an effect on the outcome of the case.” (citing Chapman, 386 U.S. at 24, 87 S.Ct. 824)).[12]
Even assuming the government had tried to meet its burden, it cannot here. Looking to the record, the government previewed Giddins’s statements to the police in its opening statement, telling the jury that Giddins lied to the police about his whereabouts during the September 25th robbery—the only robbery in which he was an active participant—which damaged Giddins’s credibility before the jury. J.A. 131-32. Also on the first day of trial, during Det. Taylor’s testimony, the video was played by the government, and Det. Taylor was asked to narrate and describe what was happening. J.A. 194-97. On the second day of trial, the government called two witnesses to refute Giddins’s alibi for *887 September 25th—the general manager of the restaurant where Giddins worked, and Giddins’s parole officer. J.A. 245-55.
During closing arguments, the government relied on Giddins’s repeated use of his phone in the videotape, as well as Giddins’s statement that he had been reprimanded at work for using his phone to prove that Giddins’s cell phone was always with him in order to corroborate the cell site location information and refute any contention that the phone did not accurately represent Giddins’s location at a given time. J.A. 615-16. Finally, at the end of the closing, the government emphasized that “Mr. Giddins lied” when he provided an alibi to the police, and reminded the jury of the witnesses who came in to refute the alibi. J.A. 622-23. The government specifically told the jury, “The Defendant lied to create an alibi for the day of the robbery so that he wouldn’t be caught, and he hoped that no one would be able to prove him wrong.” J.A. 623.
As the Fifth Circuit has recognized, where “the government’s closing argument relied on the very evidence that offends [a constitutional right], we cannot see how the government can conclusively show that the tainted evidence did not contribute to the conviction.” United States v. Jackson, 636 F.3d 687, 697 (5th Cir. 2011) (internal quotation marks and alterations omitted). We largely agree, although we stop short of adopting such a conclusive rule. Although Giddins’s statements were not the focal point of the government’s closing argument, the statements and evidence brought in to refute his alibi were essential links in the chain of evidence presented to the jury that the government argued led to conviction. On this set of circumstances, we cannot see a way for the government to prove beyond a reasonable doubt that the inadmissible statements did not contribute to the conviction. Therefore, we find this error not harmless, and reverse the conviction.
IV.
For the foregoing reasons, we conclude that Giddins’s waiver of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1965), was involuntary, and that his post-waiver statements were therefore inadmissible. We further conclude that the error in introducing those statements was not harmless. Therefore, the judgment of conviction is

REVERSED.

. The video is contained in the record as a separate attachment to the J.A, with a cover sheet contained at J.A. 64. The government on request of the Court submitted a transcript of the video. Gov’t’s Ltr. re: Transcript Request, Attach., ECF No. 63-2. Although the Court is appreciative of the government's transcript, it was not always entirely accurate based on the Court’s own viewing of the video. As such, quotes from the video contained in this opinion are based on both the government’s submitted transcript and corrections from the Court’s own review. Citations to quotes are therefore given by time stamp rather than citation to a page in the transcript.

. At the time, it was unknown to Giddins that Det. Taylor and Det. Morano were from different agencies.

. Kim was later revealed to Giddins to be FBI Special Agent Sung Kim.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Giddins also moved to suppress cell site location information (CSLI) obtained from his cell phone without a warrant, suppression of which was also denied. Giddins appeals that issue to us as well, and this appeal was held in abeyance pending this Court’s decision in United States v. Graham, 824 F.3d 421 (4th Cir. 2016) (en banc), pet. for cert, filed, No. 16-6308 (U.S. Sept. 26, 2016) and No. 16-6694 (U.S. Oct. 27, 2016). In Graham, we decided that "the government does not violate the Fourth Amendment when it obtains historical CSLI from a service provider without a warrant.” 824 F.3d at 425. As such, Giddins "raises this issue in order to preserve it for further review,” but acknowledges that Graham controls. Appellant's Br. at 53. We note the issue, but reject it as a grounds for appeal here in light of Graham.

. In disagreeing with our conclusion, our dissenting colleague cites to cases where each of the factual circumstances discussed above was alone insufficient to transform an encounter with the police into a custodial situation. We do not disagree that individually each of these factual circumstances would not suffice to establish custody. However, to properly perform the totality of the circumstances analysis, we must consider how the combina *881 tion of these factual circumstances would affect a reasonable person in Giddins's position. It is therefore not dispositive that no single factor that we have examined could on its own create a custodial situation. Our conclusion that the situation here was custodial is based on all of these circumstances combined, i.e., in totality.

. Our dissenting colleague faults us for relying on this point, and argues that this is not in the record and thus not preserved for appeal. See post at 891-93. We disagree. Although Giddins did not flesh this point out with perfect clarity in the district court below, his attorney made clear to the district court that there was "a certain amount of leveraging of the return of the car as well.” J.A. 109; see also J.A. 53 (“The Detectives ... us[ed] Mr. Giddins’ interest in getting his car returned as leverage.”). Further, Giddins expressly made this argument in his opening brief to this Court. See Appellant's Br. at 16 ("Mr. Giddins was faced with losing his vehicle, which was his means of maintaining his livelihood, unless he answered the detectives’ questions.”); id. at 17 ("His vehicle enabled him to travel to and from his current job.”). We believe this is enough for Giddins to preserve the issue and enables him to argue it here. Finally, even if not adequately preserved below, the government did not argue before this Court that Giddins had in any way waived this argument in its opposition brief—a position the government clearly knew how to take. Compare Ap-pellee’s Br. at 18-19 (responding to the economic coercion argument) with id. at 25-26 (arguing that Giddins waived his ability to object to his career offender designation). In such circumstances, “[w]e are entitled to excuse a defendant's waiver in the district court if the government fails to properly and timely raise a waiver contention in its brief.” United States v. Palomino-Coronado, 805 F.3d 127, 130 n.3 (4th Cir. 2015) (citations omitted).

. The government's brief does not actually address the specifics of Det., Morano’s response to Giddins and focuses almost exclusively on Det. Taylor's response. See Appel-lee’s Br. at 19-20. However, because the government’s argument on this point essentially turns on the definition of "trouble” and refers to the conduct of the "officers,” we will read the government’s brief to argue that Det. Morano's response was also truthful. If the government intended to make a different argument as to Det. Morano, any such argument is waived.

. The government argues specifically that Giddins "had completed a federal sentence for arson and at the time of his sentencing for the instant bank robbery, had a criminal history category of IV even before application of the career offender enhancement.” Appellee's Br. at 22 (citations omitted). Although this information was not before the district court at the time of the suppression hearing, we may consider it in deciding whether to affirm the court’s pre-trial denial of a motion to suppress. United States v. Gray, 491 F.3d 138, 148 (4th Cir. 2007).

. The Court in Fulminante did note a distinction between "statements by a defendant [that] may concern isolated aspects of the crime or may be incriminating only when linked to other evidence” and "a full confession in which the defendant discloses the motive for and means of the crime [that] may tempt the jury to rely upon that evidence alone in reaching its decision.” 499 U.S. at 296, 111 S.Ct. 1246. Falling within the former category, however, does not mean the defendant is entitled to a lesser degree of harmless error review, although the Court’s opinion suggests that the latter category is less likely to be harmless.

. The government’s argument consists of one paragraph, which in short says "[assuming arguendo that either Giddins’s statement or his Miranda waiver had been involuntary, he suffered no prejudice from the introduction of the video recording of his questioning. The government had abundant evidence of Giddins’s guilt even without the admission of his statements.” Appellee's Br. at 24.

.To the extent the government contends that the standard from Thompson is no longer applicable, we note that the holding in Fulminante did not call into question the holding of Thompson, nor has any subsequent en banc opinion of this court. See United States v. Collins, 415 F.3d 304, 311 (4th Cir. 2005) ("A decision of a panel of this court becomes the law of the circuit and is binding on other panels unless it is overruled by a subsequent en banc opinion of this court or a superseding contrary decision of the Supreme Court.” (quoting Etheridge v. Norfolk & W. Ry. Co., 9 F.3d 1087, 1090 (4th Cir. 1993))).